2004 ME 34

**STATE of Maine**

v.

**Edwin GRAHAM.**

Supreme Judicial Court of Maine.

Argued: Feb. 13, 2004.

Decided: March 10, 2004.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), Andrew Benson, Asst. Attorney General, Augusta, for State.

Steven A. Juskewitch (orally), Ellsworth, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CLIFFORD, J.

[¶ 1] Edwin Graham appeals from a judgment of conviction for manslaughter (Class A), 17–A M.R.S.A. § 203(1)(A) (Supp.2003),[1] entered after a jury verdict in the Superior Court (Hancock County, *Marden, J.*). Graham contends that the court erred when it failed to instruct the jury on sexual self-defense and that this

---

1. Section 203(1)(A) provides: "A person is guilty of manslaughter if that person ... [r]ecklessly, or with criminal negligence, causes the death of another human being. Violation of this paragraph is a Class A crime."

error deprived him of his right to a fair trial. We disagree and affirm the judgment.

## I.  BACKGROUND

[¶ 2] The evidence at trial disclosed the following: On Friday, December 21, 2001, Graham attended a Christmas party hosted by his employer, George Carter, at Carter's store. Zachary Savoy, who lived above the party's location, arrived at the party with a beer in his hand and was more outgoing than usual, according to several of the party-goers. Graham and Savoy were introduced at the party, conversed, and agreed to meet at Graham's trailer after the party ended.

[¶ 3] After visiting at the home of a friend, Graham testified that he went back to his trailer, and found Savoy already inside.[2] The two men chatted for a while and drank some beer or vodka. Savoy began to talk about a swingers' bar in Boston and got up to change the track playing on the stereo. Returning to his seat, Savoy put his hand on Graham's shoulder. When Graham turned to look in Savoy's direction, Savoy's face was close to his. Graham then took Savoy's arm and gently placed him back into his seat. Graham told Savoy to respect his space, believing that Savoy had made a pass or a sexual advance. Savoy continued to talk about the swingers' club.

[¶ 4] After this incident, Savoy and Graham talked about "outdoor stuff." Savoy pulled out some marijuana. Graham, who had recently quit smoking marijuana and was planning on applying for his commercial driver's license, told Savoy to put the marijuana away or leave. Savoy began to get agitated, and Graham offered him a homemade tinfoil pipe that Graham once used to smoke marijuana. Graham, however, then took Savoy's marijuana and threw it in the trash. He attempted to pull Savoy toward the door. Savoy stated "I'm olzi hime of all time. Don't f--- with me,"[3] and lunged toward Graham. A fistfight ensued.

[¶ 5] The fight escalated and moved outside the trailer as Graham continued to kick and punch Savoy, causing Savoy to bleed significantly. Graham hit Savoy across the bridge of his nose with a baseball bat, causing the bat to break in half. Savoy managed to land only three punches during the altercation, one to Graham's face and two to his arms. At some point during the altercation, Savoy was lying in the snow and Graham went to get help. Graham then heard snow crunching behind him and thought it was Savoy coming after him. Graham testified that at this point, "everything started going red" and his "world went black."

[¶ 6] When the fight finally ended, Graham went to get his neighbor, and told the neighbor that he had been in a fistfight. The neighbor then walked over to the scene with Graham. After viewing Savoy's "bloody and swollen" condition, and hearing what he described as a "death rattle," the neighbor went back to his home and asked his wife to call an ambulance.

[¶ 7] Savoy had suffered numerous injuries, including multiple blunt force injuries to the back of his head, a broken nose, extensive injuries to his face, abrasions and bruises on his face and lips, a chipped tooth, a knocked-out tooth, crushed cartilage and a crushed hyoid bone in his throat, abrasions and bruises to his shoul-

---

2.  The evidence relating to what occurred after the party is essentially taken from the testimony of Graham. That testimony is otherwise uncorroborated.

3.  Graham testified that he had no idea what "olzi hime of all time" meant.

ders and torso, and five stab wounds, one of which deflated his right lung. The chief medical examiner concluded that Savoy's death, which occurred at 7:30 A.M. on December 22, was caused by those injuries. Savoy had traces of morphine in his blood and a blood-alcohol level of .17, indicating that he had a blood-alcohol level of .27 at the time of the altercation. Graham had virtually no injuries.

[¶ 8] The State charged Graham with intentional or knowing murder, 17–A M.R.S.A. § 201(1)(A), and depraved indifference murder, 17–A M.R.S.A. § 201(1)(B). At trial, Graham presented evidence that when he was a child, his older brother chased him into the woods and sexually assaulted him. Dr. Geoffrey Thrope, the State psychologist, testified that Graham suffers from post-traumatic stress disorder, and that he believes that when Graham heard footsteps from behind, he entered a dissociative state, triggered by his childhood memories and the related disorder.

[¶ 9] At the conclusion of the trial, Graham requested a jury instruction on sexual self-defense. 17–A M.R.S.A. § 108(2)(A)(2) (1983 & Supp.2003).[4] The court declined to instruct on sexual self-defense, finding that the evidence did not generate such an instruction. The court found that "the jury would have to make a significant leap under all of the circumstances ... to suggest that there is evidence that would justify a use of deadly

force defense of being, in effect, a threat of forcible sexual violence." The court did, however, instruct the jury as to traditional self-defense. 17–A M.R.S.A. § 108(2)(A)(1) (1983 & Supp.2003).[5]

[¶ 10] After deliberating for six hours, the jury returned a verdict, finding Graham not guilty of murder, but guilty of manslaughter. Graham was sentenced to thirty years imprisonment, with all but eighteen years suspended, and six years of probation. This appeal by Graham followed.

## II. DISCUSSION

[¶ 11] Graham contends that the evidence presented in this case generated a sexual self-defense instruction, which he requested and which the court improperly denied.

[¶ 12] We review a trial court's decision to deny a party's request for a jury instruction for prejudicial error. *State v. Doyon,* 1999 ME 185, ¶ 7, 745 A.2d 365, 367. A defendant is entitled to an instruction on the use of deadly force in defense of a person when the evidence is "sufficient to make the existence of all the facts constituting the defense a reasonable hypothesis for the fact-finder to entertain." *State v. Glidden,* 487 A.2d 642, 644 (Me. 1985). When determining whether the evidence is sufficient to raise the issue of sexual self-defense, the evidence must be

. . . .

4. Section 108(2)(A)(2) provides:

> 2. A person is justified in using deadly force upon another person:
> A. When the person reasonably believes it necessary and reasonably believes such other person is:
>
> . . . .
>
> (2) Committing or about to commit a kidnapping, robbery or a violation of section 253, subsection 1, paragraph A, [gross sexual assault as a result of compulsion] against the person or a 3rd person;

5. Section 108(2)(A)(1) provides:

> 2. A person is justified in using deadly force upon another person:
> A. When the person reasonably believes it necessary and reasonably believes such other person is:
>
> . . . .
>
> (1) About to use unlawful, deadly force against the person or a 3rd person . . . .

viewed in the light most favorable to the defendant. *State v. Michaud,* 1998 ME 251, ¶ 17, 724 A.2d 1222, 1230. If the evidence is sufficient to generate the issue of sexual self-defense, the State has the burden to negate the existence of sexual self-defense beyond a reasonable doubt. *State v. Smith,* 472 A.2d 948, 951 (Me. 1984).

[¶ 13] Pursuant to the applicable version of 17–A M.R.S.A. § 108(2)(A)(2), "[a] person is justified in using deadly force upon another person ... [w]hen the person reasonably believes it necessary and reasonably believes such other person is ... [c]ommitting or about to commit ... a violation of section 253, subsection 1, paragraph A, [gross sexual assault as a result of compulsion] against the person." A defendant must actually believe that deadly force is necessary to repel a forcible gross sexual assault that is being committed, or is about to be committed, against him. *Smith,* 472 A.2d at 950. Moreover, this actual belief of the defendant must be objectively reasonable. *Id.*

[¶ 14] In arguing that the evidence generated a jury instruction on sexual self-defense, Graham emphasizes two specific incidents. Graham testified that while inside Graham's trailer, Savoy talked about a swingers' bar and made a sexual pass at him. Once outside the trailer, Graham testified that he heard the sound of Savoy's footsteps as he approached Graham from behind, for what Graham considered to be for the purpose of sexually assaulting him.

[¶ 15] Graham argues that the pass Savoy made, coupled with his talk about a swingers' bar, indicated that Savoy had sex on his mind and was about to commit a sexual assault. The evidence, however, does not support Graham's position that he honestly and actually believed that a sexual assault was about to be committed against him in the trailer. Graham conceded at trial that, after Savoy referred to the swingers' bar and made what Graham concluded was a sexual advance towards him, he felt no need to act in self-defense. Graham in fact testified that he was unsure whether Savoy's act was sexual, i.e., a pass at him or an attempt to kiss him. Moreover, based on the circumstances surrounding the incident, any belief on Graham's part that Savoy's making a pass at him, standing alone, justified the use of deadly force is not objectively reasonable. *See Smith,* 472 A.2d at 950. It is not objectively reasonable for the intended recipient of a sexual advance to believe that the pass demonstrates an intent or purpose to commit a gross sexual assault by compulsion. We have held that "[t]he statements that [the decedent] 'made a move towards [the Defendant] like he was a fag' are no evidence that [the decedent] was committing, or about to commit, a forcible sex offense." *State v. Philbrick,* 481 A.2d 488, 492 (Me.1984).[6] Savoy's ac-

---

6. Graham relies on *State v. Philbrick,* 402 A.2d 59 (Me.1979) (*Philbrick I*), to support his contention that the evidence regarding the pass was sufficient to require the trial court to instruct the jury on sexual self-defense. The facts in *Philbrick I,* however, were very different from the present case. In *Philbrick I,* the victim had already committed a forcible sex offense, namely by fondling the defendant's crotch, and the defendant believed that the victim was about to commit another forcible sex offense. *Id.* at 60. Placing a hand on someone's crotch area is clearly a sexual advance, unlike the more ambiguous evidence Graham presented in this case, that Savoy made what Graham interpreted as a nonviolent pass at him.

In addition, in *Philbrick I,* the statute provided for sexual self-defense when reasonably necessary to prevent a "forcible sexual offense." *Id.* The current statutory provision, applicable to the present case, is more narrowly defined and allows the use of deadly force for sexual self-defense only when rea-

tions in Graham's trailer certainly do not come close to generating a sexual self-defense instruction.

[¶ 16] In arguing that he was entitled to an instruction on sexual self-defense, Graham also relies on what happened outside the trailer. He asserts that he perceived Savoy rushing to attack him from behind, and that, because of Savoy's prior conduct in the trailer, the talk of the swingers' bar, the pass, and the manifestation of violence by Savoy's engaging in the fistfight, coupled with the way Graham was sexually abused in the past, justified his use of deadly force. We disagree.

[¶ 17] Graham contends that he had a subjective belief that he was about to be forcefully sexually assaulted by Savoy when he heard what he thought were Savoy's footsteps from behind later in the altercation, and that he believed that he needed to use deadly force to repel such an attack. Dr. Thorpe noted the similarities in the earlier sexual assaults Graham endured as a child at the hands of his brother and the story Graham recounted about Savoy coming at him from behind. Even if we assume that Graham honestly believed that Savoy was coming up behind him for the purpose of sexually assaulting him, and honestly believed that deadly force was needed to prevent such an assault, such a belief is not objectively reasonable under the circumstances. The fight was intense and had gone on for a considerable period of time. Graham had clearly prevailed; Savoy was down on the ground and covered in blood; and Graham was virtually unharmed. Graham admitted at trial that, physically, he was more than a match for Savoy.

[¶ 18] A belief that Savoy's purpose in coming up behind Graham was to sexually assault Graham, as opposed to continuing

sonably necessary to prevent a gross sexual assault by means of compulsion. *See* 17–A

the fight, and a further belief that a forceful sexual assault could be repelled only by the use of deadly force, are simply not objectively reasonable. There is no objective evidence in the record to suggest that Savoy was trying to, or would have been capable of, incapacitating Graham in order to sexually assault him. There is no evidence that Savoy made *any* attempt to forcefully sexually assault Graham. Savoy had not shown any ability to overpower Graham physically, and did not have any weapons.

[¶ 19] Even when viewed in the light most favorable to Graham, the evidence is not sufficient to generate a jury instruction on sexual self-defense. The court properly declined to so instruct the jury.

The entry is:

Judgment affirmed.

M.R.S.A. § 108(2)(A)(2); *see also* 17–A M.R.S.A. § 253 (1983 & Supp.2003).