2006 ME 91

**STATE of Maine**

v.

**Eugene W. NEILD.**

Supreme Judicial Court of Maine.

Submitted On Briefs: June 28, 2006.

Decided: July 27, 2006.

Geoffrey Rushlau, District Attorney, Donald Lawson–Stopps, ADA, Lincoln County Courthouse, Wiscasset, for the State.

Barry Pretzel, Esq., Rockland, for the defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

DANA, J.

[¶ 1] Eugene W. Neild appeals from a judgment of conviction for aggravated assault (Class B), 17–A M.R.S. § 208(1)(C) (2005), entered after a jury trial in the Superior Court (Lincoln County, *Bradford, A.R.J.*), contending that the court erred in refusing to instruct the jury on the use of force in the defense of premises.[1] We agree and vacate the judgment.

## I.  BACKGROUND

[¶ 2] On the morning of December 2, 2003, Neild was at the home of his new girlfriend.[2] He had stayed with her the night before and was making breakfast in the kitchen when the victim arrived.

[¶ 3] The victim and the girlfriend had been dating for about a year and had been engaged, but had recently split up. Although the victim had been living with the girlfriend, he had moved in with his father about three weeks before the incident. The girlfriend had a young son from a previous relationship, but the victim treated him like his own son. The child had spent the night with the victim and, on the morning of December 2, he was returning the child to the girlfriend.

[¶ 4] When the victim arrived, he walked into the kitchen and saw Neild making breakfast.[3] He took the girlfriend's son to his room, called the girlfriend names, left the home, and drove off in his truck. The victim returned about five minutes later, knocked on the door, and told the girl-friend that he wanted to get his things. According to the victim, the girlfriend "pretty much said no," but he started taking things out to his truck. The girlfriend testified that the victim "looked crazy" and was yelling profanities at her. She told him that she wanted a police officer present, but she did not call one.

[¶ 5] There was conflicting evidence about what happened next. The victim testified that while he was in the bedroom getting his mattress, the bedroom door flew open as Neild entered the room and punched him in the side of his head. According to the victim, Neild hit him several times in the face and strangled him while yelling for him to "get out." The victim "dazed off" and, when he came to, he said, "stop," but Neild hit him a few more times. As the victim left the bedroom, Neild hit him on the back of the head. As the victim was leaving, he saw that the girlfriend and her son were outside. He left the property after telling Neild that he was going to get some friends to help him get his things. When the victim returned, a couple of hours later, no one was in the home, and he called the police to report the assault. The responding officer testified that the victim had extensive facial injuries—lacerations on his face, one of his eyes was shut, and his face was black and blue.

[¶ 6] Neild testified that the victim was in a "complete rage," throwing furniture around while calling the girlfriend names. According to Neild, he went to the bedroom to ask the victim to leave. He testified that as soon as he asked the victim to leave, the victim took a swing at him and

---

1. Neild also contends that the court erred in allowing the State to use his prior convictions to impeach him, and argues that the court's self-defense jury instruction was confusing and inadequate. These contentions are without merit.

2. Neild testified that the girlfriend had invited him to her home.

3. Neild and the girlfriend had been dating for about three weeks at the time of the incident.

they got into a wrestling match, both throwing punches at each other. He said that he got the victim in a headlock, but when he let the victim go, he came at him again so the fighting continued. He testified that, as the victim was leaving, he told Neild that he was going to get his friends and a gun.

[¶ 7] The girlfriend testified that, before Neild went into the bedroom, he asked her what she wanted him to do, to which she responded, "I don't know." She testified that she was outside but could hear yelling and wrestling from the bedroom. When the victim came out, she saw blood on him. She did not see any injuries on Neild. She testified that, after the victim left, Neild asked if she was okay, and told her that he was sorry and that he "needed to get out of there."

[¶ 8] Neild was indicted for aggravated assault (Class B), 17–A M.R.S. § 208(1)(C), and his case was tried before a jury. At trial, the court instructed the jury on self-defense, but denied Neild's request for a jury instruction on the defense of premises as provided in 17–A M.R.S. § 104(1) (2005). The jury found Neild guilty of aggravated assault, and the court sentenced him to eight years in prison, with all but six years suspended, and four years of probation. Neild appeals.

## II.  DISCUSSION

[¶ 9] Neild contends that the court erred in refusing to instruct the jury on the use of force in the defense of premises. "Whether a jury should be instructed on a particular defense in a criminal case almost always depends on whether the evidence presented at trial generates the defense." *State v. Christen,* 1997 ME 213, ¶ 4, 704 A.2d 335, 337 (quotation marks omitted). A defense is generated if the evidence, viewed in the light most favorable to the defendant, "is sufficient to make the existence of all facts constituting the defense a reasonable hypothesis for the fact finder to entertain." *Id.* (quotation marks omitted).

[¶ 10] The defense of premises justification for the use of force is defined as:

A person in possession or control of premises or a person who is licensed or privileged to be thereon is justified in using nondeadly force upon another when and to the extent that he reasonably believes it necessary to prevent or terminate the commission of a criminal trespass by such other in or upon such premises.

17–A M.R.S. § 104(1); *see also State v. Dyer,* 2001 ME 62, ¶ 5, 769 A.2d 873, 875. The court refused to give the instruction, concluding, in pertinent part, that there was no evidence that "would indicate that [Neild] was a lawful occupant of the premises" or that the girlfriend had specifically requested the victim to leave.

A.  Possession or Control of Premises or Licensed to be Thereon

[¶ 11] The first issue is whether Neild was "[a] person in possession or control of [the] premises or a person who [was] licensed or privileged to be thereon." 17–A M.R.S. § 104(1). "A 'licensee' in the context of tort law is a 'person who is privileged to enter or remain on land only by virtue of the possessor's consent.'" *Dyer,* 2001 ME 62, ¶ 6, 769 A.2d at 875 (quoting RESTATEMENT (SECOND) OF TORTS § 330 (1965)). Because the evidence demonstrates that Neild entered and remained on the girlfriend's property with her consent, he was "licensed or privileged to be thereon." The court erred in concluding that there was no evidence that Neild was a lawful occupant of the premises.

## B. Criminal Trespass

[¶ 12] The next issue is whether Neild " 'reasonably believe[d]' he was 'terminat[ing] the commission of a criminal trespass.'" *Id.* ¶ 7, 769 A.2d at 876 (alteration in original) (quoting 17–A M.R.S. § 104(1)). "A person in the position of [the victim] commits a criminal trespass if, 'knowing that [he] is not licensed or privileged to do so, ... [r]emains in any place in defiance of a lawful order to leave that was personally communicated to [him] by the owner or another authorized person.'" *Id.* (quoting 17–A M.R.S. § 402(1)(D) (2005)).

[¶ 13] The victim "could become a trespasser by failing to leave after being given a lawful order to leave by the owner." *Id.* ¶ 8, 769 A.2d at 876. "[T]he mere demand of the owner constitutes a lawful order for the purposes of the criminal trespass statute." *Id.* (quotation marks omitted). The evidence, viewed in the light most favorable to Neild, is sufficient for a jury to entertain as a reasonable hypothesis that the girlfriend personally communicated to the victim a lawful order to leave.[4]

## III. CONCLUSION

[¶ 14] Taken together, the evidence, viewed in the light most favorable to Neild, is sufficient for a jury to entertain as a reasonable hypothesis that: (1) the girlfriend communicated to the victim a lawful order to leave; (2) Neild reasonably believed that the victim was defying that lawful order; and (3) Neild was licensed to be on the premises. Because the evidence generated the defense of premises defense, the court erred by refusing to so instruct the jury.

The entry is:

Judgment vacated. Remand to Superior Court for further proceedings consistent with this opinion.

---

4. The victim testified:

"I went up to the door and knocked on it. [The girlfriend answered and I] told her that I wanted my stuff."
Q. Did she respond to that?
A. She pretty much said no, and I told her that I was going to get my stuff ....

He also testified:

[The girlfriend] was telling me that she wanted an officer present and I told her to go ahead and call one up because ... I am taking [my stuff]. I told her to go ahead and call the police, [but] she didn't.

The girlfriend testified:

Q. At some point did you tell the victim to come back at another time with a cop?
A. Yes, I did.
Q. Did he do that?
A. No.

Neild testified:

Q. Did anyone tell the victim to leave?
A. [The girlfriend] asked him to leave a couple of times and she asked him to get a police officer.
Q. Did he do that?
A. No, he didn't.