MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2019 ME 28
Docket:      Pen-18-170
Argued:      December 12, 2018
Decided:     February 21, 2019

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, and CLIFFORD, JJ.

STATE OF MAINE

v.

PHILIP S. FOURNIER

JABAR, J.

[¶1]  Philip S. Fournier appeals from a judgment of conviction of murder, 17-A M.R.S. § 201(1)(A) (2017), entered by the court (Penobscot County, *A. Murray, J.*) after an eleven-day jury-waived trial.  Fournier challenges (1) the court's method of considering evidence of alternative suspects, (2) the court's exclusion of a detective's opinion testimony, (3) the court's finding that Fournier waived his religious privilege, and (4) the court's factual findings relating to Fournier's whereabouts from 8:00 p.m. until 8:45 p.m. on the day of the murder.[1]  We affirm.

---

[1]  Because there is competent evidence in the record to support the court's factual findings regarding Fournier's whereabouts during this time period, we do not discuss this factual challenge further.  *See State v. Black*, 2000 ME 211, ¶ 17, 763 A.2d 109 ("It is the [trial court's] duty to reconcile conflicting testimony, determine its relative weight, and decide which part of the testimony was credible and worthy of belief.").

## I. BACKGROUND

[¶2]  Viewing the evidence in the light most favorable to the State, the trial record supports the following facts, which were found by the court in its judgment dated February 22, 2018.  *See State v. Jeskey*, 2016 ME 134, ¶ 2, 146 A.3d 127.  Because Fournier did not request findings of fact pursuant to M.R.U. Crim. P. 23(c), we will also infer that the trial court found all of the facts necessary to support its judgment, to the extent that those assumed facts are supported by competent record evidence.  *See State v. Fox*, 2017 ME 52, ¶ 12, 157 A.3d 778.

[¶3]  In the early evening of August 8, 1980, a group of teenagers and young adults gathered at Schenck High School in East Millinocket.  Among the group that gathered at the high school that evening was nineteen-year-old Fournier.  During the same evening, the sixteen-year-old victim left her home in East Millinocket to go for a jog.  At approximately 7:55 p.m.,[2] three people saw the victim heading down Orchard Street.  The same three individuals saw the victim turn off Orchard Street and proceed down a dirt road behind the first

---

[2]  Sunset in East Millinocket on August 8, 1980 was at 7:53 p.m., and civil twilight ended at 8:26 p.m.

base dugout of a little league field;[3] this was the last time that anyone reported seeing the victim alive.

[¶4]  At some point between 6:30 and 7:30 p.m., Fournier was seen by several people with a person named Leroy; they were walking away from the high school toward the little league field.  One individual saw Fournier and Leroy drinking whiskey out of a bottle on their way to the field.

[¶5]  At approximately 8:15 p.m., Leroy was seen back at the high school pacing, talking to himself, and exhibiting other strange behaviors.  Fournier was not seen again until approximately 8:45 p.m., when an East Millinocket police officer saw Fournier with Leroy.  Fournier was also seen by another individual at around 9:00 p.m.  He was running on the sidewalk by the high school and carrying a bottle of whiskey; another person was seen running about eight to ten feet behind him.  In the early morning of August 9, 1980, Fournier stole an oil truck and crashed it into another vehicle.  After the crash, Fournier was found unconscious; he had suffered severe head trauma and was in a coma for a period of time.

---

[3]  The little league field is adjacent to the high school, with two dugouts along the first and third base lines.  A dirt road runs behind the first base dugout, parallel with the first base line, and continues beyond the little league field, behind a soccer field, to a short path that leads through a wooded area into a clear-cut area with power lines.

[¶6]  When the victim did not return home on the evening of August 8, 1980, her mother made phone calls and drove around East Millinocket looking for her.  August 8, 1980, was a hot summer evening, and heavy thunderstorms moving through East Millinocket made the victim's mother's search difficult. The following day, a group of people, including a teenager named Peter, joined in the search for the victim.  The search efforts on Saturday, August 9, 1980, were unsuccessful, and the group discontinued the search at night and made plans to continue the search early the next morning.

[¶7]  In the early morning of Sunday, August 10, 1980, Peter began searching for the victim alone and, at approximately 6:00 a.m., he found the victim's body on the pole line behind the soccer and little league field.  East Millinocket and Maine State Police responded to the scene and quickly discovered that the victim had a large jagged wound on the back of her head.  A large rock with ceramic debris on top of it was located next to the victim's head, and it was later determined that the ceramic debris came from an electric insulator.

[¶8]  A police dog employed at the scene assisted investigators in finding several articles of the victim's clothing and a partially broken insulator on the ground.  The next day, the police dog was brought back to the scene and it again

alerted to the partially broken insulator, which at that time was collected by investigators as the potential murder weapon. In addition, investigators collected several pieces of insulator fragments and a rock that had some discoloration.[4]

[¶9] As the investigation into the victim's death continued, Fournier was still in the hospital recovering from the injuries he suffered from the car accident. Upon his release from the hospital, Fournier was admitted into a substance abuse program and did not return to East Millinocket until late December 1980. Although Fournier was identified as a suspect in the victim's death early on in the investigation, he was not questioned during the first months of the investigation because of the injuries he suffered from the accident.

[¶10] On May 5, 1981, Fournier met with investigators and led them down the path behind the soccer field to the pole line and to the area where the victim's body was found. During this walk-through of the crime scene, Fournier informed investigators that, sometime after dark on August 8, 1980, he walked to the pole line alone and tripped over a dead body. Fournier accurately

---

[4] Because of the heavy rain that occurred on Friday and Saturday night, no biological material was discovered on the insulator, insulator fragments, or the rock. Overall, there was no forensic evidence discovered that tied Fournier or anyone else to victim's death.

pointed out the area where the victim's body had been found and correctly described to the investigators the state of the victim's body.

[¶11] One week later, on May 12, 1981, Fournier had his stepfather drive him to a local parsonage so that he could meet with a pastor. During that meeting, Fournier revealed to the pastor that he had killed the victim by hitting her with a pole with a knob on it, but stated that he did not sexually assault her. The pastor told Fournier that he did not believe Fournier's statement that he had killed the victim and that he would only believe him if Fournier told his mother and stepfather what he had done. Fournier's mother and stepfather arrived at the parsonage at the pastor's request, and Fournier also told them that he had killed the victim. Afterwards, the pastor drove Fournier to the Bangor Police Department, where Fournier met with two Maine State Police detectives. During this interview, Fournier stated that the victim had been tied with a rope, was cut by someone, and that he "had a feeling" that three guys sexually assaulted her. Fournier also said that the victim had kicked him in the leg and that he hit her once with an insulator he found on the ground. Fournier was not arrested after that interview.

[¶12] Fournier was interviewed by a different Maine State Police detective on May 15, 1981. During this interview, Fournier said that he

remembered leaving a party alone on August 8, 1980, and going to the pole line where he tripped over a female body. Fournier accurately recounted the state of the victim's body. He stated that, after he tripped over the body, he got up and ran from the crime scene. The next thing he remembered was being involved in the oil truck accident. Fournier was not arrested after this interview.

[¶13] Eight years later, in June 1989, Fournier began working at Husson College as a janitor. During his first night on the job, Fournier met with his supervisor, who asked Fournier some questions to get to know him. After learning that Fournier was from East Millinocket, the supervisor asked Fournier if he knew about the victim's murder, and Fournier responded that he knew about the murder because he was the one who had killed the victim with a glass insulator. The supervisor later asked why he had not been arrested, and Fournier proclaimed that he had "beat" all of the interviews.

[¶14] Twenty-seven years later, in March 2016, Fournier was indicted for the victim's murder. *See* 17-A M.R.S. § 201(1)(A). Several pre-trial motions were filed by the State and Fournier; the State moved to exclude evidence of alternative suspects, and Fournier filed a motion concerning a number of his anticipated evidentiary objections, including the applicability of the religious

8

privilege to the statements he made to the pastor. The court determined that Fournier had waived his religious privilege, but it did not make a preliminary ruling on the State's motion to exclude evidence of alternative suspects.

[¶15] During the eleven-day jury-waived trial, the court heard testimony from one of Maine's former Chief Medical Examiners, who opined that the victim's death was caused by blunt impact injury to her head, with a contributing cause of neck injuries consistent with asphyxiation. Other testimony regarding the autopsy established details about the victim's body that matched details provided by Fournier that had not been disclosed to the public.

[¶16] Following the jury-waived trial, the court found Fournier guilty of murder and imposed a forty-five-year sentence of incarceration. Fournier filed a motion to vacate the judgment and grant a new trial, but the court denied the motions. This timely appeal followed. *See* 15 M.R.S. § 2115 (2017); M.R. App. P. 2B(b)(1).

## II. DISCUSSION

A.  Alternative-Suspect Evidence

[¶17] At trial, Fournier attempted to introduce evidence of a number of alternative suspects. The proffered evidence was sometimes admitted *de bene*

and was at other times excluded outright by the court. Fournier's first challenge to the court's judgment concerns the method by which the court considered the evidence of alternative suspects.[5] Specifically, Fournier asserts that the court should have considered all of the evidence regarding alternative suspects collectively instead of considering it "piecemeal." Further, Fournier contends that the court's judgment did not clearly demonstrate which evidence the court had considered and which evidence it had excluded in determining that the alternative-suspect evidence did not rise to a sufficient probative level to create a reasonable doubt. We review a court's decision to exclude alternative-suspect evidence for an abuse of discretion. *See State v. Mitchell*, 2010 ME 73, ¶ 23, 4 A.3d 478.

[¶18] The defense strategy of presenting evidence of alternative suspects is an attempt to demonstrate that the State has failed to meet its burden of proving that the defendant was the person who committed the crime. *State v. Jaime*, 2015 ME 22, ¶ 31, 111 A.3d 1050. This strategy does not alter or shift the burden of proof; rather, "it is simply an evidentiary method utilized by a defendant to demonstrate reasonable doubt . . . ." *Id*. ¶¶ 31-32. Evidence of

---

[5] Fournier also requests that we reform the standard for admitting alternative-suspect evidence. We decline to adopt Fournier's invitation to reform the law regarding alternative-suspect evidence, and do not address this issue further.

alternative suspects is admissible if it satisfies the requirements of a two-part analysis. First, the "[a]lternative suspect evidence offered by the defendant, as with any evidence, must be . . . admissible." *Id.* ¶¶ 33-34. Second, the admissible evidence of alternative suspects must be "of sufficient probative value to raise a reasonable doubt as to the defendant's culpability by establishing a reasonable connection between the alternative suspect and the crime."[6] *Id.* ¶ 34.

> The connection between the alternative perpetrator and the crime must be reasonably established by the admissible evidence the defendant is prepared to offer. Without such evidence, a defendant cannot be allowed to use his trial to conduct an investigation that he hopes will convert what amounts to speculation into a connection between the other person and the crime.

*State v. Dechaine*, 572 A.2d 130, 134 (Me. 1990).

[¶19] Here, there was nothing improper in the manner by which the court considered the evidence of alternative suspects. Contrary to Fournier's assertions, the court properly excluded inadmissible evidence of alternative suspects under the first part of the analysis and admitted *de bene* other evidence of alternative suspects to see if the evidence would, when combined

---

[6] Maine, unlike other jurisdictions, does not require that the defendant "clearly link[]" the alternative suspect to the crime. *State v. Cruthirds*, 2014 ME 86, ¶ 23, 96 A.3d 80. Rather, only a "reasonable connection" is required for the evidence of alternative suspects to be admissible. *Id.* ¶¶ 22-23.

with later-admitted evidence, create a reasonable doubt. *See Jaime*, 2015 ME 22, ¶¶ 34-37, 111 A.3d 1050. Further, the court properly excluded "evidence that [was] too speculative or conjectural or too disconnected from the facts of [the] defendant's prosecution." *Dechaine*, 572 A.2d at 134 (quotation marks omitted).

[¶20] Lastly, if Fournier desired any clarification of the court's judgment and whether it considered the evidence admitted *de bene*, he could have filed a post-judgment motion for additional findings of fact. *See* M.R.U. Crim. P. 23(c). Because Fournier did not move for additional findings, we infer that the court made all of the factual findings necessary to support its determination that the admissible evidence of alternative suspects did not raise a reasonable doubt as to Fournier's culpability by establishing a reasonable connection between the alternative suspects and the crime. *See Fox*, 2017 ME 52, ¶ 12, 157 A.3d 778. In sum, we find no abuse of the court's discretion in the method by which it excluded and considered evidence of alternative suspects.

B. Exclusion of Detective's Opinion Testimony

[¶21] Fournier's second assignment of error relates to a line of questioning between Fournier's trial counsel and a Maine State Police detective that was excluded by the court under M.R. Evid. 701. The line of questioning

12

concerned the inculpatory statements made by Fournier on May 12, 1981, and why the detective had not arrested Fournier after he made those statements. This inquiry drew an objection from the State, and the court ultimately made the following ruling on the admissibility of the detective's opinion: "I am not going to allow him to give his opinion as to evaluation of the evidence. If there are pieces that were -- of evidence that he believed were missing or wrong, then I'm going to allow him to testify to that." We review a trial court's ruling on the admissibility of nonexpert opinion testimony for an abuse of discretion. *State v. Dube*, 2016 ME 50, ¶ 10, 136 A.3d 93.

[¶22] Rule 701 states, "If a witness is not testifying as an expert, opinion testimony is limited to opinions that are . . . [r]ationally based on the witness's perception[] and . . . [h]elpful to clearly understanding the witness's testimony or to determining a fact in issue." M.R. Evid. 701. "Determining admissibility pursuant to Rule 701 is within the discretion of the trial court, which has the opportunity to observe the witness." *State v. Robinson*, 2015 ME 77, ¶ 24, 118 A.3d 242 (alterations omitted) (quotation marks omitted).

[¶23] Contrary to Fournier's contention, the court did not abuse its discretion by refusing to allow the witness to opine about the sufficiency of the evidence against Fournier while allowing the witness to testify about

subsidiary issues in the investigation, such as missing or inaccurate evidence. *Cf. State v. Cunningham*, 1997 ME 60, ¶¶ 4-6, 691 A.2d 1219.

C.    Waiver of Religious Privilege

[¶24]  Lastly, Fournier contends that the court erred when it found that Fournier had voluntarily waived his religious privilege by repeating to his mother, stepfather, and law enforcement substantial portions of the statements that he had made to the pastor. We review a trial court's factual finding that an evidentiary privilege has been waived for clear error. *State v. Lipham*, 2006 ME 137, ¶ 7, 910 A.2d 388.

[¶25]  "A person has a privilege to refuse to disclose, and to prevent any other person from disclosing, a confidential communication made to a member of the clergy who was acting as a spiritual adviser at the time of the communication." M.R. Evid. 505(b). However, a person waives the privilege "if the person . . . voluntarily discloses or consents to the disclosure of any significant part of the privileged matter." M.R. Evid. 510(a).

[¶26]  Here, there is competent evidence in the record that Fournier disclosed to his mother and stepfather a significant part of the confidential communication he made to the pastor. Although Fournier did not disclose to his mother and stepfather every detail of the information that he had disclosed

to the pastor, he disclosed a "significant part" of the privileged matter, namely, that he had killed the victim. *See Lipham*, 2006 ME 137, ¶¶ 5-8, 910 A.2d 388 (quotation marks omitted). Therefore, the court did not err in determining that Fournier had waived the religious privilege.

## III. CONCLUSION

[¶27] In conclusion, the court did not abuse its discretion in the way it considered alternative suspect evidence or by excluding the opinion testimony of the Maine State Police detective, and it did not err in finding that Fournier had waived his religious privilege.

The entry is:

Judgment affirmed.

---

Rory A. McNamara, Esq. (orally), Drake Law, LLC, Berwick, for appellant Philip S. Fournier

Janet T. Mills, Attorney General, Lara M. Nomani, Asst. Atty. Gen. (orally), and Leanne Robbin, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2016-800
FOR CLERK REFERENCE ONLY