MAINE SUPREME JUDICIAL COURT                     Reporter of Decisions
Decision:     2021 ME 31
Docket:       Cum-20-235
Argued:       April 6, 2021
Decided:      June 17, 2021

Panel:        MEAD, GORMAN, JABAR, HORTON, and CONNORS, JJ.

STATE OF MAINE

v.

MARK CARDILLI JR.

GORMAN, J.

[¶1]  Very early in the morning of March 16, 2019, Mark Cardilli Jr. shot and killed Isahak Muse at the Cardilli home in Portland.  A Cumberland County grand jury then indicted Cardilli for the intentional or knowing murder of Muse, 17-A M.R.S. § 201(1)(A) (2021), and, after a bench trial, the trial court (Cumberland County, *Mills, J.*) found Cardilli guilty of the lesser included offense of manslaughter (Class A), 17-A M.R.S. § 203(1)(A) (2021).  Cardilli appeals, arguing that the State failed to disprove beyond a reasonable doubt one of his self-defense justifications and that the trial court erred in failing to analyze another of his self-defense justifications.  We affirm the judgment.

## I. BACKGROUND

A.    Factual Background

[¶2]  The following facts were found by the trial court and are all fully supported by the record. *See State v. Fournier*, 2019 ME 28, ¶ 2, 203 A.3d 801. On March 4, 2019, Cardilli returned to his parents' home in Portland after serving five years in the Army.  In the preceding year, there had been considerable discord in the Cardilli household.  Cardilli's parents were separated and living in different bedrooms, and Cardilli's seventeen-year-old sister had recently been placed under bail conditions after she was found riding in a stolen vehicle with her twenty-two-year-old boyfriend, Muse.

[¶3]  The bail conditions prohibited all contact between the sister and Muse, but the sister completely ignored that prohibition, as well as the remaining bail conditions.  Cardilli's father attempted to control his daughter's behavior and to restrict her time with Muse, but she openly disobeyed both him and the bail order.  Despite the bail conditions, Cardilli's parents often granted Muse permission to visit.

[¶4]  On March 15, 2019, Cardilli's parents denied their daughter's request to allow Muse to come to the home.  In defiance of that denial, the sister told Muse to come, and he arrived at the Cardilli home at 10:00 p.m.  The family

argued over Muse's arrival, but the parents eventually agreed that Muse could stay until 1:00 a.m. Cardilli's father asked Cardilli to check on his sister at 1:00 a.m. to make sure Muse left. Muse had been drinking alcohol all day on March 15, and he and the sister drank alcohol together that night. Both were affected by the alcohol that night.[1]

[¶5] At approximately 1:00 a.m., Cardilli sent a text message to his sister informing her of the time. When that prompt failed to result in Muse's departure, Cardilli and his mother went to the sister's room and told Muse that he had to leave. Over the course of the next ten to fifteen minutes, Muse pleaded with Cardilli's mother for permission to stay, but she continued to tell him to leave.

[¶6] Eventually, Cardilli's father joined the argument and reiterated the message that Muse had to leave. Cardilli and his father walked Muse toward the door to a breezeway, and opened the door to get him to leave, but "he just wouldn't go." While Cardilli and his father were attempting to get Muse to leave, Cardilli's mother announced that her daughter had hit her, and Muse pushed his way back into the kitchen and kept pushing both Cardilli and his father. Cardilli attempted to grab Muse but could not overpower him.

---

[1] At autopsy, Muse's blood alcohol content was 0.181 grams per 100 milliliters.

4

[¶7]  Believing that the situation was escalating, Cardilli left the kitchen and headed to his bedroom to retrieve his gun.  He decided against bringing the gun back to the kitchen, however, and returned without it.  In the kitchen, he found Muse and his father "locked onto each other."  Cardilli pushed Muse against the counter, prompting Muse to throw a punch at Cardilli, which missed.  Cardilli again told Muse that he had to leave, at which point the sister began hitting and scratching her parents and Cardilli.

[¶8]  Cardilli went back to his bedroom, grabbed his gun, and put it in his pocket.  He returned to the kitchen and told his father to get behind him.  Cardilli then pulled out the gun and told Muse that he had to leave because he was done struggling with him.  When he saw the gun, Muse responded by yelling for his phone in order to call for a ride home.  The sister then charged at Cardilli and began to strike him, so Cardilli pointed the gun away from her.  As soon as Cardilli was able to get his sister off him, Muse started punching him.  Cardilli's father was able to get Muse off Cardilli and threw Muse into the sister's bedroom onto the bed.  Muse got up and punched Cardilli in the face at least four or five times.  Muse punched Cardilli again and, as Muse started to throw another punch, Cardilli raised his gun and shot him.  Because Muse had raised his left arm, the first shot grazed his left finger and his eyebrow.  As Muse

twisted, Cardilli shot him two more times. Muse had no weapons and never tried to grab Cardilli's gun. After the shooting, which occurred at approximately 1:43 a.m., Cardilli called the police and reported that he had shot Muse.

[¶9] The cause of Muse's death was the internal and external bleeding resulting from the two gunshot wounds. The entrance wounds were on the back of the right side of Muse's torso, and both were contact entrance wounds, meaning that, at the time the shots were fired, the gun's muzzle was touching the outer surface of Muse's clothing. Cardilli and his father suffered minimal injuries as a result of the night's events.

B.     Procedural Background

[¶10]     Cardilli was indicted for intentional or knowing murder, 17-A M.R.S. § 201(1)(A), a charge to which he pleaded not guilty. After a five-day jury-waived trial in December of 2019, the trial court found Cardilli not guilty of the charge of intentional or knowing murder, but found him guilty of manslaughter, 17-A M.R.S. § 203(1)(A). In reaching this conclusion, the trial court first found that the State had proved, beyond a reasonable doubt, that Cardilli's killing of Muse was both voluntary and knowing. The court then analyzed Cardilli's claimed justifications: physical force in defense of himself or others pursuant to 17-A M.R.S. § 108(2)(B) (2021); use of force in defense of

6

premises pursuant to 17-A M.R.S. § 104(3) (2021);[2] and "imperfect self-defense" pursuant to 17-A M.R.S. § 101(3) (2021).

[¶11]  Applying section 108(2)(B), the court found that the State had failed to prove beyond a reasonable doubt that Cardilli did not *actually believe* that (1) Muse had entered, attempted to enter, or surreptitiously remained in the Cardilli home without a license; and (2) his use of deadly force was necessary to prevent Muse from inflicting bodily injury upon Cardilli or someone else in the home.  The court also found, however, that the State had

---

   [2]  Although Cardilli's arguments in his brief focused solely on the portions of the trial court's decision with regard to 17-A M.R.S. § 108(2)(B) (2021), he noted that his arguments apply equally to the trial court's conclusion as to the justification of defense of premises pursuant to 17-A M.R.S. § 104(3) (2021).  The State agrees that similar elements apply in assessing both defenses and did not address section 104(3) independently.

   Section 104(3) provides,

> **3.**  A person in possession or control of a dwelling place or a person who is licensed or privileged to be therein is justified in using deadly force upon another person:
>
> > **A.** Under the circumstances enumerated in section 108; or
> >
> > **B.** When the person reasonably believes that deadly force is necessary to prevent or terminate the commission of a criminal trespass by such other person, who the person reasonably believes:
> >
> > > **(1)** Has entered or is attempting to enter the dwelling place or has surreptitiously remained within the dwelling place without a license or privilege to do so; and
> > >
> > > **(2)** Is committing or is likely to commit some other crime within the dwelling place.

   Due to the similarities between the statutes, our analysis evaluating Cardilli's arguments under section 108(2)(B)(1) applies equally to section 104(3)(B)(1).

proved beyond a reasonable doubt that Cardilli's beliefs as to both of these conditions were objectively unreasonable. Because the court found that Cardilli had an actual belief that deadly force was necessary to protect himself or someone else from Muse, but also found that that belief was objectively unreasonable, it applied section 101(3) and found Cardilli not guilty of murder, but guilty of manslaughter, "a crime for which recklessness or criminal negligence suffices."

[¶12] Cardilli then asked the trial court to reconsider its verdict and requested additional findings of fact and conclusions of law. *See* M.R.U. Crim. P. 23(c). Cardilli argued that when a claim of self-defense is evaluated regarding a charge of manslaughter—where recklessness or criminal negligence suffices for the state-of-mind element—the State must prove beyond a reasonable doubt not only that Cardilli's belief was objectively unreasonable but further that the belief was reckless, i.e., a gross deviation from what a reasonable and prudent person would believe. In presenting this argument, Cardilli relied on *State v. Smith*, 472 A.2d 948, 951 (Me. 1984), and its progeny. The court denied the motion to reconsider its judgment but granted the motion for additional findings of fact and conclusions of law. In its order, the court re-analyzed Cardilli's beliefs under the "gross deviation" standard and found,

     In formulating his subjective but objectively unreasonable belief that . . . Muse entered, attempted to enter, or surreptitiously remained in the dwelling place without a license or privilege to do so, [Cardilli] acted recklessly or with criminal negligence and [his] disregard of the risk or failure to be aware of the risk was a gross deviation of the standard of conduct that a reasonable and prudent person would observe in the same situation.

     In formulating his subjective but objectively unreasonable belief that deadly force was necessary to prevent . . . Muse from inflicting bodily injury upon defendant or a third person present in the dwelling, [Cardilli] acted recklessly or with criminal negligence and his disregard of the risk or failure to be aware of the risk was a gross deviation of the standard of conduct that a reasonable and prudent person would observe in the same situation.

(Citation and footnote omitted.)

[¶13]  The court found Cardilli guilty of manslaughter and imposed a sentence of eleven years in prison, with all but seven and a half years suspended, and four years of probation.  Cardilli timely appealed.  *See* 15 M.R.S. § 2115 (2021); M.R. App. P. 2B(b)(1).

## II.  DISCUSSION

A.  Standard of Review

[¶14]  On appeal, Cardilli argues that (1) the State failed to prove beyond a reasonable doubt that his beliefs—that Muse was not licensed or privileged to enter or had surreptitiously remained in the Cardilli home and that Cardilli needed to shoot Muse to prevent him from inflicting bodily injury as that phrase

is used in section 108(2)(B)—were gross deviations from what a reasonable and prudent person would believe; and (2) the trial court erred in failing to analyze his self-defense justification pursuant to 17-A M.R.S. § 108(2)(A) (2021).

[¶15]  The present case requires us to examine the self-defense justifications defined in section 108 and the application of "imperfect self-defense" established by section 101(3).  Our review of the trial court's interpretation of a justification defense is de novo.  *State v. Cannell*, 2007 ME 30, ¶ 6, 916 A.2d 231.  "In doing so, we interpret the relevant statute according to its plain language.  Only if that plain language is ambiguous will we go on to consider other indicia of legislative intent to discern its meaning."  *State v. Carter*, 2016 ME 157, ¶ 5, 150 A.3d 327 (citation omitted).

[¶16]  In order to address Cardilli's arguments, we begin by noting that, in 2008, the Legislature enacted a significant change to section 101(3).  P.L. 2007, ch. 475, § 10 (effective June 30, 2008).  From 1999 until 2008, the statute read,

> Conduct that is justifiable under this chapter constitutes a defense to any crime; provided that, if a person is justified in using force against another, but the person recklessly injures or creates a risk of injury to 3rd persons, the justification afforded by this chapter is unavailable in a prosecution for such recklessness.  If a defense provided under this chapter is precluded solely because the

> requirement that the person's belief be reasonable has not been met, the person may be convicted only of a crime for which recklessness or criminal negligence suffices, *and then, only if holding the belief, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to the person, is grossly deviant from what a reasonable and prudent person would believe in the same situation.*

(Emphasis added.)  P.L. 1999, ch. 357, § 1 (effective Sept. 18, 1999); P.L. 2007, ch. 475, § 10 (effective June 30, 2008).  In 2008, the Legislature amended section 101(3) by deleting the last phrase.  P.L. 2007, ch. 475, § 10 (effective June 30, 2008) (codified at 17-A M.R.S. § 101(3) (2021)).  As amended, it provides,

> Conduct that is justifiable under this chapter constitutes a defense to any crime; except that, if a person is justified in using force against another, but the person recklessly injures or creates a risk of injury to 3rd persons, the justification afforded by this chapter is unavailable in a prosecution for such recklessness.  If a defense provided under this chapter is precluded solely because the requirement that the person's belief be reasonable has not been met, the person may be convicted only of a crime for which recklessness or criminal negligence suffices.

17-A M.R.S. § 101(3) (2021); 17-A M.R.S. § 101(3) (2008).

[¶17]  In short, since 2008, to disprove a claim of self-defense for any crime for which recklessness or criminal negligence suffices for the state-of-mind element, the State is no longer required to prove beyond a reasonable doubt that the defendant's belief is "grossly deviant from what a

reasonable and prudent person would believe in the same situation."[3] 17-A M.R.S. § 101(3).  If the State proves beyond a reasonable doubt that a defendant's actual beliefs concerning the justification requirements are not reasonable, the defendant cannot be convicted of a crime that requires proof of knowledge or intent, but he can be convicted of a crime that requires proof of criminal negligence or recklessness.[4]  17-A M.R.S. § 101(3).

---

[3] A summary of the proposed legislation provided by the Legislature's Office of Policy and Legal Analysis explains,

> Section 10 of the bill eliminates the current precondition for a conviction for a crime for which recklessness or criminal negligence suffices that the State, in addition to proving beyond a reasonable doubt that the person's belief is unreasonable, prove beyond a reasonable doubt that the person's holding of that belief "when viewed in light of the nature and purpose of the person's conduct and the circumstances known to the person, is grossly deviant from what a reasonable and prudent person would believe in the same situation."

L.D. 1240, Summary (123d Legis. 2008).

[4] For reasons we cannot entirely explain, this change appears to have been largely ignored. Although thirteen years have now elapsed since 2008, we have never addressed this significant change in the law.  In January of 2012, we cited the statute three times without quoting it in *State v. Ouellette*, 2012 ME 11, ¶¶ 8, 9, 20 n.4, 37 A.3d 921.  Two months later, in *State v. Hanaman*, we cited to the amended version of section 101(3).  2012 ME 40, ¶ 13 n.4, 38 A.3d 1278 ("If a defendant acted with imperfect self-defense, in that it may have been unreasonable for him to believe that deadly force was necessary, then the defendant 'cannot be held criminally liable for any crime requiring intention or knowledge of the actor, but he can be held responsible for a crime for which recklessness or criminal negligence suffices as the culpable mental state.'").  We cited that language from *Hanaman* four years later in *State v. Kimball*, but did not mention section 101(3).  2016 ME 75, ¶ 6, 139 A.3d 914.  Most recently, in *State v. Marquis*, we cited section 101(3) in a reference to imperfect self-defense.  2017 ME 104, ¶ 19 n.5, 162 A.3d 818.

In none of these cases, however, did we discuss the *change* to section 101(3).  And, perhaps as a result, the primary tool relied upon by trial judges and trial attorneys drafting jury instructions—Alexander, *Maine Jury Instruction Manual* § 6-61 at 6-131 to 6-133 (2020-2021 ed. 2020)—has not been updated to reflect the change in the law.

[¶18]  Thus, in its original judgment, when it determined whether the State had proved, beyond a reasonable doubt, that Cardilli's beliefs about the need to use deadly force were not objectively reasonable, the trial court properly applied 17-A M.R.S. § 101(3).  Cardilli's demand that the court consider whether the State had proved not only that the belief was unreasonable, but that it was reckless, was based on statutory language that has not existed since 2008.  *See* P.L. 2007, ch. 475, § 10.

[¶19]  With this understanding in mind, we turn to Cardilli's claim that his actions in shooting Muse were justified according to section 108(2)(B).

B.     Section 108(2)(B)

[¶20]  Because the trial court concluded that Cardilli presented sufficient evidence to raise the self-defense justification provided by section 108(2)(B), we review whether the evidence—when viewed in the light most favorable to the State—supports the court's finding that the State disproved the self-defense justification beyond a reasonable doubt.  *State v. Nadeau*, 2007 ME 57, ¶ 10, 920 A.2d 452; 17-A M.R.S. § 101(1) (2021).

[¶21]  Section 108 provides two possible justifications for a person who has used deadly force.[5]  The second of these justifications, contained in section 108(2)(B), provides that the use of deadly force is justified as follows:

**B.**  When the person reasonably believes:

> **(1)** That such other person has entered or is attempting to enter a dwelling place or has surreptitiously remained within a dwelling place without a license or privilege to do so; and

> **(2)** That deadly force is necessary to prevent the infliction of bodily injury by such other person upon the person or a 3rd person present in the dwelling place.

[¶22]  Section 108(2)(B), consistent with other justification provisions, authorizes the use of deadly force, but only where the fact finder determines both (1) that the defendant has a reasonable belief regarding the existence of a condition or occurrence of an event and the necessity of a particular response to that condition or event and, (2) that the State has failed to disprove that reasonable belief beyond a reasonable doubt.  *See also* 17-A M.R.S. § 101(1) (2021); *State v. Ouellette*, 2012 ME 11, ¶ 8, 37 A.3d 921.  The person must have a "reasonable belief" about both the condition or event—the threatening circumstances—*and* the necessity of deadly force to address those threatening

---

[5]  Deadly force is "physical force that a person uses with the intent of causing, or that a person knows to create a substantial risk of causing, death or serious bodily injury."  17-A M.R.S. § 2(8) (2021).

14

circumstances. 17-A M.R.S. § 108(2)(B). We have explained that such a "reasonable belief" contains both a subjective and an objective element. *State v. Graham*, 2004 ME 34, ¶ 13, 845 A.2d 558. In the context of section 108(2)(B), this requires two findings. First, the fact finder must find the subjective element, i.e., that the person *actually believes* that another person has entered or is attempting to enter a dwelling place or has surreptitiously remained within a dwelling place without a license or privilege to do so, and that deadly force is necessary to prevent the infliction of bodily injury by that person upon himself or a third person present in the dwelling place. 17-A M.R.S. § 108(2)(B); *see Ouellette*, 2012 ME 11, ¶ 10, 37 A.3d 921.

[¶23] Second, the fact finder must find the objective element, i.e., that the person's actual beliefs—that another person has entered or is attempting to enter a dwelling place or has surreptitiously remained within a dwelling place without a license or privilege to do so and that deadly force is necessary to prevent the infliction of bodily injury by that person upon himself or a third person present in the dwelling place—were *reasonable*. 17-A M.R.S. § 108(2)(B). The standard for judging the reasonableness of a defendant's belief concerning the need to use deadly force is determined from the point of

view of a reasonable and prudent person under the same circumstances. *See Smith*, 472 A.2d at 951.

[¶24]  To summarize, if a person has an actual, reasonable belief that another person has entered or is attempting to enter a dwelling place or has surreptitiously remained within a dwelling place without a license or privilege to do so and actually and reasonably believes that deadly force is necessary to protect himself or someone else from bodily injury, that person's conduct—his use of deadly force—constitutes self-defense pursuant to section 108(2)(B). *See Graham*, 2004 ME 34, ¶ 13, 845 A.2d 558.  This justification would result in "a complete defense, meaning that it negates the commission of the crime; an act committed in self-defense is simply no crime at all."  *Ouellette*, 2012 ME 11, ¶ 9, 37 A.3d 921 (quotation marks omitted).

[¶25]  If, on the other hand, a person lacks an actual belief that another person has entered or is attempting to enter a dwelling place or has surreptitiously remained within a dwelling place without a license or privilege to do so or lacks an actual belief that deadly force is necessary to protect himself or someone else from bodily injury, his conduct does not constitute self-defense pursuant to section 108(2)(B).

16

[¶26] There is a third option, however. Pursuant to section 101(3), if a defendant actually believes that another person has entered or is attempting to enter a dwelling place or has surreptitiously remained within a dwelling place without a license or privilege to do so and actually believes that deadly force is necessary to protect himself or third persons from bodily injury, *but the belief as to either is not reasonable,* he may not be convicted of crime with intentional or knowing state-of-mind elements. 17-A M.R.S. § 108(2)(B). Nonetheless he may "be convicted . . . of a crime for which recklessness or criminal negligence suffices." 17-A M.R.S. § 101(3). This is known as "imperfect self-defense." *State v. Hanaman*, 2012 ME 40, ¶ 13 n.4, 38 A.3d 1278.

[¶27] Here, the trial court found that the State had failed to disprove, beyond a reasonable doubt, that Cardilli *actually* believed both that Muse had entered or was attempting to enter the Cardilli home or had surreptitiously remained within the Cardilli home without a license or privilege to do so and that deadly force was necessary to prevent Muse from inflicting bodily injury upon himself or someone else. The court, however, also found that the State had proved, beyond a reasonable doubt, that Cardilli's actual beliefs as to both conditions were objectively unreasonable. Based on that finding, and in light of its earlier finding that Cardilli's killing of Muse was both voluntary and

knowing, the court found that the State had proved, beyond a reasonable doubt, that Cardilli was guilty of the lesser included offense of manslaughter, for which recklessness or criminal negligence suffices. *See* 17-A M.R.S. § 203(1)(A). The court held that Cardilli's actual but objectively unreasonable beliefs as to whether circumstances existed that would allow him to lawfully use deadly force against Muse "negate[d] the commission of the crime" of murder, but not the crime of manslaughter. *Ouellette*, 2012 ME 11, ¶ 9, 37 A.3d 921.

[¶28] Contrary to Cardilli's assertions, there was competent record evidence to support the court's determination that Cardilli's belief that Muse was not licensed or privileged to enter the Cardilli home or that he surreptitiously remained therein was objectively unreasonable. The plain language of the statute requires only that Muse had license, i.e., consent, to enter, *see State v. Neild*, 2006 ME 91, ¶ 11, 903 A.2d 339, and the court's explicit finding that Muse had the parents' consent to be present is fully supported by the record, including Cardilli's own testimony. As the court found, Cardilli knew that Muse entered the home at 10:00 p.m. and knew that Muse had been permitted to stay in the home by Cardilli's parents.

[¶29] Even if Muse overstayed his welcome at the Cardilli home, as he clearly did, that fact is irrelevant. Section 108(2)(B)(1) requires a focus on

whether Muse "entered or . . . attempt[ed] to enter [the Cardilli home] . . . without a license or privilege to do so," and not whether he *remained* there without a license or privilege to do so. Persons whose license or privilege to stay is revoked can be deemed trespassers, and the law does permit homeowners to use *nondeadly* force to eject trespassers. 17-A M.R.S. § 104(1) (2021). Deadly force, however, can be used against only trespassers who are about to commit arson, 17-A M.R.S. § 104(2) (2021), or whose entry to the building was either unsanctioned or whose continued presence in the building is "surreptitious" *and* who are committing or about to commit a crime other than criminal trespass. 17-A M.R.S. § 104(3) (2021). In other words, deadly force in defense of premises may be used against intruders who are committing or about to commit assault or some other crime and against arsonists. 17-A M.R.S. § 104(2)-(3).

[¶30] Cardilli's arguments concerning his belief as to whether Muse surreptitiously remained in the Cardilli home are also unpersuasive. In *State v. Harding*, we defined "surreptitiously remaining" as "stealthily, secretly[,] or clandestinely" remaining on the premises. 392 A.2d 538, 542 (Me. 1978). Applying this definition, it is clear that even if Cardilli held a belief that Muse surreptitiously remained in the Cardilli home after 1:00 a.m., that belief was

objectively unreasonable. The trial court explicitly found that Cardilli was aware that Muse was still at the Cardilli home after 1:00 a.m. After his entry at 10:00 p.m. on March 15, Muse did not leave the home while he was alive.

[¶31] As explained above, when viewed in the light most favorable to the State, *Nadeau*, 2007 ME 57, ¶ 10, 920 A.2d 452, the evidence amply supports the court's finding that the State proved, beyond a reasonable doubt, that Cardilli's belief that Muse was not licensed or privileged to enter or attempt to enter or that Muse surreptitiously remained in the Cardilli home was objectively unreasonable. Because section 108(2)(B) is conjunctive, we need not decide whether the court erred in concluding that Cardilli's belief that it was necessary to use deadly force to prevent Muse from inflicting bodily injury on Cardilli or his family was also objectively unreasonable.[6] *See Smith*, 472 A.2d at 951.

C.      Section 108(2)(A)

[¶32] In his appeal to us, Cardilli also contends, citing section 108(2)(A), that the trial court erred in failing to consider whether the State disproved that he reasonably believed that he needed to shoot Muse to prevent Muse from

---

[6] Title 17-A M.R.S. § 108(2)(B)(2) (2021) requires only that the defendant believe "[t]hat deadly force is necessary to prevent the infliction of bodily injury," and 17-A M.R.S. § 104(3)(B)(2) (2021) requires only that the defendant believe that deadly force is necessary to prevent the intruder from committing any crime other than criminal trespass.

shooting one of the Cardillis. The State argues that Cardilli explicitly waived his right to challenge this issue on appeal by not requesting that the trial court apply section 108(2)(A).

[¶33] "If a defendant explicitly waives the delivery of an instruction or makes a strategic or tactical decision not to request it, we will decline to engage in appellate review, even for obvious error." *State v. Nobles*, 2018 ME 26, ¶ 34, 179 A.3d 910; *State v. Ford*, 2013 ME 96, ¶ 16, 82 A.3d 75 ("[Section] 101(1) . . . specif[ies] that a trial court is not required to instruct on an affirmative defense that has been waived by the defendant."); 17-A M.R.S. § 101(1) ("This subsection does not require a trial court to instruct on an issue that has been waived by the defendant. The subject of waiver is addressed by the Maine Rules of Unified Criminal Procedure."); M.R.U. Crim. P. 51.

[¶34] The record clearly shows that Cardilli not only failed to request a self-defense justification pursuant to section 108(2)(A), but explicitly argued that the evidence did not generate the self-defense justification. He argued in a written memorandum in support of closing, "This is not a self-defense case under [section] 108(2)(A) where the [c]ourt needs to determine whether [Muse] was going to inflict deadly force on any of the inhabitants of [the Cardilli home]." Further, even though he asked the court to reconsider some of its

rulings, Cardilli never suggested that the self-defense justification provided by section 108(2)(A) had any application.

[¶35]   Even if we were to assume that Cardilli's section 108(2)(A) argument was not expressly waived, we find it unpersuasive.  The court's findings regarding the level of "threat" posed by Muse preclude a finding that Cardilli held an objectively reasonable belief that Muse was about to use unlawful, deadly force against anyone in the household.  As mentioned above, the court explicitly found that Muse was not armed and that he did not at any time try to grab Cardilli's gun.  The court specifically found that Muse's response to seeing the gun was to ask for his phone so he could call for a ride home.  Even if Cardilli had an actual belief that Muse was about to use deadly force by taking control of the gun that Cardilli brought into the chaos—a belief not asserted by Cardilli at trial—the court found that any such belief was objectively unreasonable.  The court aptly noted that "Muse had been drinking all day on March 15, 2019 and was impaired. Deadly force was not required to prevent minimal bodily injury or to remove . . . Muse from the house."

The entry is:

Judgment affirmed.

22

Jamesa J. Drake, Esq. (orally), Drake Law LLC, Auburn, and Rory A. McNamara, Esq., Drake Law LLC, York, for appellant Mark Cardilli Jr.

Aaron M. Frey, Attorney General, and Leanne Robbin, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2019-1823
FOR CLERK REFERENCE ONLY