MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2020 ME 51
Docket:       Pen-19-237
Argued:       March 4, 2020
Decided:      April 21, 2020

Panel:        MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.*

RICHARD WATSON

v.

STATE OF MAINE

JABAR, J.

[¶1]  Richard Watson appeals from a judgment of the Unified Criminal Docket (Penobscot County, *Lucy, J.*) denying his petition for post-conviction review.  We conclude that Watson was deprived of the effective assistance of counsel when his trial attorney introduced into evidence and played for the jury a videotaped recording of the ten-year-old victim's interview with law enforcement.  We therefore vacate the judgment and remand with instructions to grant the petition and vacate the defendant's convictions.

---

 *  Although Chief Justice Saufley participated in the appeal, she resigned before this opinion was certified.

# I. BACKGROUND

## A.     Trial and Convictions

[¶2]  On November 25, 2014, Watson was indicted on two counts of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C) (2018), one count of unlawful sexual contact (Class A), 17-A M.R.S. § 255-A(1)(F-1) (2018), and one count of visual sexual aggression against a child (Class C), 17-A M.R.S. § 256(1)(B) (2018).

[¶3]  A two-day jury trial was held in July 2015.[1]  To begin the trial, the State called the victim, who testified that she was born in 2003 and that the defendant was her biological father.  The victim recounted two instances of sexual abuse that occurred during the summer of 2014, when she was ten years old.  According to the victim's testimony, Watson told her that he would buy her a cell phone if she engaged in certain sexual activity with him; she agreed because she wanted a phone.  The victim testified that the first incident occurred on August 4, 2014, and Watson bought her a phone the following day. The victim testified that a second incident occurred later that summer, and that both incidents took place in Watson's home.  She also testified that he showed her pornographic videos and showed her how to use sex toys.

---

[1] We summarized the facts in *State v. Watson*, 2016 ME 176, ¶¶ 2-8, 152 A.3d 152.

[¶4]   The State also introduced testimony from the victim's mother, grandmother, and aunt, all of whom testified that the victim made disclosures to them following the sexual abuse.[2]   The victim's grandmother and aunt both testified that the victim had feelings of guilt following the abuse.[3]   On the first day of trial, the State also called the nurse practitioner who performed a physical examination on the victim after she reported the abuse.   The nurse practitioner testified without objection that the physical examination of the victim was normal, but explained that "[i]t's actually the norm to have a normal exam in this type of situation."   On cross-examination, she testified that there were no signs of trauma.   A Maine State Police trooper testified as the State's final witness in its case in chief on the second day of trial.   He testified that he assisted in the execution of a search warrant of Watson's house and seized pornographic DVDs, sex toys, and two computers.

---

[2] The victim's aunt was permitted to testify under the "first complaint rule" that the victim made a disclosure to her. *See id*. ¶ 4; *see also State v. Fahnley*, 2015 ME 82, ¶¶ 19-26, 119 A.3d 727. The victim's grandmother and mother did not testify as to the contents of the victim's disclosures.

[3] At trial, Watson objected to the testimony that the victim was "feeling guilty." As we explained in *State v. Watson*, the victim's statements to her aunt and grandmother about her feelings of guilt were admissible under the hearsay exception for a declarant's then-existing state of mind. 2016 ME 176, ¶¶ 11-12, 152 A.3d 152; *see* M.R. Evid. 803(3).

4

[¶5] Watson's defense counsel presented five witnesses, including Watson and a Maine State Police detective. The detective testified that the computers seized from Watson's house were never searched.

[¶6] Watson denied the allegations that he bought the victim the phone because she agreed to allow him to try to have sex with her. He testified that he purchased the cell phone at the same time he took the victim back-to-school shopping in August 2014. Watson and his former girlfriend both testified that they had sex toys that Watson kept in his bedroom, but Watson denied ever showing the sex toys to the victim. Likewise, he testified that he never kissed the victim, showed her pornography on his laptop, asked her to use sex toys, or otherwise tried to engage in sexual activity with her.

[¶7] After Watson testified, and just prior to resting his case, Watson's attorney offered into evidence without objection the video recording of the victim's September 2014 police interview with a female detective. The following exchange took place:

> **DEFENSE COUNSEL**: Nothing further. I think we're gonna play the video now of [the detective's] interview with [the victim] last September.
> **THE COURT**: And that's agreed to come into evidence?
> **DEFENSE COUNSEL**: Yes.
> **ASSISTANT DISTRICT ATTORNEY**: That's fine.
>                  . . .
> **THE COURT**: Is that cued up?

**DEFENSE COUNSEL**: Yes.
**THE COURT**: Okay. Dim the lights.
(Defendant's Exhibit No. 2, a video recording, was played at 1:20 p.m. and was concluded at 1:51 p.m.)
**DEFENSE COUNSEL**: The defense rests, Your Honor.

Defense counsel did not provide the jury with any context for the video interview before or after it was played.

[¶8] The video showed the victim describing, consistent with her testimony at trial, the two incidents of sexual abuse that occurred. In addition to a recitation of the facts by the victim, the detective was shown telling the victim that she had done the right thing by reporting the incidents, that "the grownups" would make sure the victim was safe, and that Watson should have known better. The victim can be seen and heard on the video stating, "So, I won't get taken away from my grandparents?" Defense counsel introduced a transcript of the video interview after the video was played for the jury, which was admitted into evidence without objection and given to the jurors when they retired for deliberations.

[¶9] The attorneys presented closing arguments to the jury shortly after the video was played. The State proffered to the jury that "the heart of the case is what [the victim] told you." In deciding whose testimony to believe, the ADA suggested that the jury ask questions like "Who's telling the truth? Who's bein'

accurate? Who are you gonna rely on?" In his closing statement, defense counsel agreed with the ADA that the victim's credibility is "the heart of this case." There was no corroborative evidence of the abuse in the form of medical evidence, eyewitness testimony, or DNA or forensic evidence.

[¶10] The jury found Watson guilty on all four counts, and the trial court (Penobscot County, *Lucy, J.*) entered judgments of conviction. Watson was sentenced to twenty-seven years' imprisonment followed by twenty years of supervised release for each of the convictions for gross sexual assault. He was sentenced to twenty years' imprisonment for the conviction for unlawful sexual contact and sentenced to five years' imprisonment for the conviction for visual sexual aggression, all to run concurrently with the convictions for gross sexual assault. Watson appealed his convictions to this Court, and we affirmed the judgment. *See State v. Watson*, 2016 ME 176, 152 A.3d 152.

B. Post-Conviction Review

[¶11] Watson filed a petition for post-conviction review in April 2017. *See* 15 M.R.S. § 2129 (2018). He claimed that his trial attorney provided ineffective assistance of counsel when he introduced into evidence the video of the victim's interview with police, which included her "detailed and highly

prejudicial allegations."[4]  Watson argued that introducing the videotaped recording of the entire interview was "unnecessary . . . to provide evidence supporting [the victim's] potential motive to fabricate the allegations."  The post-conviction court (Penobscot County, *Lucy, J.*) held an evidentiary hearing on January 23, 2019, and denied Watson's petition in an order entered on May 30, 2019.  The court made the following findings, which are supported by evidence presented at the post-conviction hearing.  *See Fahnley v. State*, 2018 ME 92, ¶ 4, 188 A.3d 871.

[¶12]  At the evidentiary hearing, Watson and his trial attorney agreed that the information that the victim provided in the interview was the "same" as, and consistent with, her testimony at trial.  The post-conviction court found that trial counsel had two rationales for playing the video of the interview for the jury: first, to support the defense theory that the detective failed to thoroughly interview the victim and, second, to show that the victim had motive to fabricate her allegations because of a custody dispute between Watson and her grandparents, whom the victim resided with at the time.

---

[4]  Watson also alleged ineffective assistance of counsel for (1) trial counsel's failure to obtain a forensic evaluation of Watson's computers that had been seized by the State, and (2) trial counsel's failure to call a witness who would potentially offer exculpatory evidence.  The post-conviction court was unpersuaded by these allegations, and we denied Watson's request for a certificate of probable cause to appeal the post-conviction court's determinations on these issues.  *See* M.R. App. P. 19.

[¶13]   Trial counsel testified at the post-conviction hearing that the theory of the defense's case, which he claimed "Watson was a big proponent of," was that the victim's allegations were motivated by a custody dispute. According to trial counsel, the victim's statement in the video interview about staying and living with her grandparents supported the defense's argument that she had motive to fabricate the allegations so that she could remain with her grandparents.

[¶14]   The post-conviction court also found that trial counsel played the video as "part of his overall strategy to discredit the State's investigation," intending to show that the victim's direct-examination testimony at trial was the same as what was said during the interview in which the detective failed to ask important questions.  The court also found that the purpose of playing the video after the victim's testimony was not to highlight inconsistencies in her story but to show the jury that this "[t]wenty-minute interview was the entirety of the State's investigation, and that the victim's story did not bear scrutiny under cross-examination . . . ."  Trial counsel believed that showing the video "would demonstrate that the victim's trial testimony was simply a repeat of the limited information covered in the . . . interview."

[¶15]  The court found that this strategy was "ultimately unsuccessful because [Watson] was convicted by the jury . . . . [who] must have unanimously found that the victim's testimony was credible . . . ."  The post-conviction court determined that trial counsel's decision to play the victim's video-recorded interview did not fall outside of the wide range of reasonable professional assistance, *see Strickland v. Washington*, 466 U.S. 668, 689 (1984), and denied Watson's petition.  The court concluded:

> Regardless of the outcome, after considering all of the issues and evidence, the court is not persuaded that trial counsel's representation "fell below an objective standard of reasonableness" or was otherwise constitutionally ineffective.

[¶16]  Watson sought a certificate of probable cause to appeal the court's denial of his petition for post-conviction review.  *See* 15 M.R.S. § 2131(1) (2018); M.R. App. P. 19(a)(2)(F).  We granted the certificate of probable cause limited to the question of whether trial counsel was ineffective "by playing at trial a video of the interview between the victim and police."  *See* M.R. App. P. 19(f).

## II.  DISCUSSION

A.   Standard of Proof

[¶17]   "The Sixth Amendment to the United States Constitution and article I, section 6 of the Maine Constitution ensure that a criminal defendant is

entitled to receive the effective assistance of an attorney." *McGowan v. State*, 2006 ME 16, ¶ 9, 894 A.2d 493; *see* U.S. Const. amend. VI; Me. Const. art. I, § 6.

[¶18]  "To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate (1) 'that counsel's representation fell below an objective standard of reasonableness' and (2) that the 'errors of counsel actually had an adverse effect on the defense.'" *Ford v. State*, 2019 ME 47, ¶ 11, 205 A.3d 896 (quoting *Strickland*, 466 U.S. at 688, 693) (alteration omitted). The petitioner bears the burden of proving both prongs of the *Strickland* test. *Id*. We review the post-conviction court's findings of fact for clear error and its legal conclusions de novo. *Id.* ¶ 9.

B.    Performance Prong

[¶19]  Pursuant to the first prong of the two-part *Strickland* test, "a petitioner must demonstrate (1) that counsel's representation fell below an objective standard of reasonableness." *Id*. ¶ 11 (quotation marks omitted). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  We have explained that "counsel's representation of a defendant falls below the objective standard of reasonableness if it falls below what might be expected

from an ordinary fallible attorney." *Fahnley*, 2018 ME 92, ¶ 18, 188 A.3d 871 (quotation marks omitted).

[¶20] "Judicial inquiry into the effectiveness of representation is 'highly deferential.' . . . '[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Middleton v. State*, 2015 ME 164, ¶ 13, 129 A.3d 962 (quoting *Strickland*, 466 U.S. at 689). However, "[a] determination that defense counsel's choices amount to 'trial strategy' does not automatically insulate them from review." *Gauthier v. State*, 2011 ME 75, ¶ 15, 23 A.3d 185, *abrogated on other grounds by Manley v. State*, 2015 ME 117, ¶ 18, 123 A.3d 219.

[¶21] Here, the post-conviction court found that defense counsel's decision to play the entire twenty-minute recorded interview at the end of the defense's case was twofold: it was part of an "overall" trial strategy designed to discredit the State's investigation and part of a strategy to show that the victim had motive to fabricate the allegations.

[¶22] During the jury trial, Watson's attorney informed the court that he intended to play a portion of the video to show the victim's motive for

fabricating the allegations. In his opening statement, trial counsel did not make *any* suggestion that the State's investigation was inadequate or incomplete. He set forth a theory that the victim fabricated the allegations to block Watson from obtaining custody. In fact, the only time trial counsel referenced the interview during his opening statement was when he described the victim's question to the detective about living with her grandparents. Trial counsel informed the jury that "this case comes down to the credibility of the witnesses." Although trial counsel challenged the officer's interviewing techniques in his closing argument, positing to the jury, "Doesn't a detective have an obligation to fully investigate a claim like this? Does accepting everything that a witness tells you without ever asking even a few tough questions that might erode or bolster that witness's credibility—this is Mr. Watson's life and reputation on the line here," he failed to present any evidence or witnesses to support his claim that the detective's interview was not thorough or to suggest that she used improper interview techniques.

[¶23] We are compelled by the record to conclude that the two strategies (undermining the victim's credibility and undermining the thoroughness of the State's investigation) were not distinct: discrediting the interview as incomplete or inadequate was *part of* the strategy of undermining the victim's

credibility by showing that she fabricated the allegations. Therefore, we must determine whether trial counsel's decision to play the entire video interview for the purpose of showing the victim's motive to fabricate the allegations and undermine her credibility was a reasonable trial strategy.

[¶24] Even affording substantial deference to this strategy, it is impossible to conclude that playing the interview video in its entirety, and producing the transcript for the jury to take into deliberations, was objectively reasonable. *See Strickland*, 466 U.S. at 688. It may have been a sound strategy to argue that the victim had a motive to fabricate because of the custody issue and that the detective's interview was too short, but these issues could have been raised and argued without playing the entire video interview. At the post-conviction hearing, trial counsel conceded that he could have brought out the victim's possible motive for fabricating the allegations by some other means. For example, he could have asked the victim about the custody statement through cross examination and introduced portions of the video transcript if the victim denied making the statement. Moreover, he could have secured the attendance of the detective who conducted the interview and questioned her about the length of the interview and the victim's statement about remaining with her grandparents. Perhaps even more perplexing is why

14

defense counsel chose to play the video at the end of his case, without re-calling the victim to the stand, when he would not be able to cross examine her regarding the statement. Over the course of the two-day trial, ten witnesses testified between when the victim testified as the State's first witness and the point at which the jury saw the video at the end of the defense's case.

[¶25] It was not just unnecessary to show the entire video to prove that the victim had motive to fabricate or that the detective's interview was insufficient, it was unreasonable to do so. As trial counsel testified during the post-conviction hearing and argued to the jury during trial, this case was a "he said/she said" case. The decision to provide the jury with *two opportunities* to hear the victim describe the alleged abuse—in a manner so consistent that even trial counsel testified at the evidentiary hearing that it was "the same"— unnecessarily bolstered her credibility.

[¶26] Cases from other states provide guidance. In *State v. Triolo*, 2013 Wisc. App. LEXIS 971, at *5-13 (Wisc. Ct. App. Nov. 19, 2013), the petitioner argued that his trial attorney was ineffective when he did not object to the State playing for the jury an entire video-recorded interview of the child victim in which she made sexual assault allegations against him. Trial counsel described the decision not to object as a "trial strategy to argue about the inconsistencies

between what [the victim] initially disclosed and what she disclosed on the stand." *Id*. at *3. However, when the video was shown, the victim had already testified at trial and that testimony was consistent with the statements made in the recorded interview. *Id*. The Wisconsin appellate court held that "trial counsel performed deficiently by failing to object to introduction of the DVD interview." *Id*. at *10. The court "reject[ed] the argument that failing to object to the State playing the DVD could be viewed as a reasonable trial strategy. . . . *The video of [the victim] giving consistent statements four years earlier served to bolster her credibility at trial. . . .* [B]ecause [the victim] testified prior to the DVD being played, trial counsel never had an opportunity to cross-examine [her] concerning her prior statements." *Id*. at *9-10 (emphasis added).

[¶27] The facts of *Triolo* are strikingly similar to those in the present case. Here, the video showing the victim giving consistent statements one year earlier served to bolster her credibility. Additionally, by choosing to play the video at the end of his case, defense counsel did not afford himself an opportunity to question the victim about the statements made during the interview. Unlike in *Triolo*, where trial counsel failed to object to the

prosecution's introduction of the video interview, Watson's attorney *introduced it* as part of the defense's case.[5]

[¶28]  Trial counsel's decision to play the video was not sound strategy, and the post-conviction court erred when it concluded that this trial conduct by defense counsel did not fall below an objective standard of reasonableness.

C.    Prejudice Prong

[¶29]  If a petitioner proves the first prong of the two-part *Strickland* test, he must then prove "that the 'errors of counsel actually had an adverse effect on the defense.'"  *Ford*, 2019 ME 47, ¶ 11, 205 A.3d 896 (quoting *Strickland*, 466 U.S. at 693) (alteration omitted).  To prove prejudice, the second prong of the *Strickland* test, Watson must establish that, but for his trial attorney's deficient performance, "there is a reasonable probability that 'the result of the proceeding would have been different.'"  *Id.* ¶ 20 (quoting *Strickland*, 466 U.S.

---

[5]  Although Watson did not raise this argument, we note that the detective made a number of gratuitous statements regarding the case that were shown to the jury in the video and in the interview transcript.  Statements included telling the victim that she "did a very smart thing by telling," that the defendant "should know better," that law enforcement's goal "is to make sure that nothing like this happens with any other little girl [the victim's] age," and expressing concern for the victim's safety at multiple points during the interview.  These statements of the detective's personal opinion impermissibly vouch for the victim's credibility.  Had the detective testified at trial, such statements would not have been admissible.  *See State v. Sweeney*, 2004 ME 123, ¶ 11, 861 A.2d 43 ("One witness's opinion of another witness's truthfulness is not helpful to the jury when the jury has the opportunity to hear both witnesses."); *State v. Crocker*, 435 A.2d 58, 77 (Me. 1981) ("Determining what credence to give to the various witnesses and their testimony is a matter within the exclusive province of the jury.").

at 694). This means that counsel's ineffective assistance "compromise[ed] the reliability of the conviction and undermin[ed] confidence in it." *Philbrook v. State*, 2017 ME 162, ¶ 8, 167 A.3d 1266 (quotation marks omitted). "A conviction may be unreliable and not worthy of confidence, thus satisfying the reasonable probability test, even without proof that a different outcome was more likely than not." *Id.* (quotation marks omitted).

[¶30] We have recognized that it may be difficult to tease apart the "'mix' of legal and factual questions" that are often presented in a *Strickland* analysis. *Fortune v. Maine*, 2017 ME 61, ¶ 13, 158 A.3d 212. Therefore, "we will apply the most appropriate standard of review for the issue raised depending on the extent to which that issue is dominated by fact or by law." *Id.*

[¶31] In this case, the post-conviction court denied Watson's petition on the performance prong; it did not make a determination as to the prejudice prong. *See Philbrook*, 2017 ME 162, ¶ 6, 167 A.3d 1266 ("A court need not 'address both components of the inquiry if the defendant makes an insufficient showing on one.'" (quoting *Strickland*, 466 U.S. at 697)). We therefore review the findings the court made for clear error and, based on that analysis, determine de novo whether counsel's unprofessional errors were prejudicial as a matter of law. *See Fortune*, 2017 ME 61, ¶ 13, 158 A.3d 212.

18

[¶32] The post-conviction court recognized that this case came down to a credibility contest between the victim and defendant. It found that

> [t]he strategy employed by Petitioner's trial counsel was ultimately unsuccessful because Petitioner was convicted by the jury on all charges. The jury must have unanimously found that the victim's testimony was credible, that the State had proven all charges beyond a reasonable doubt, and that Petitioner's denials of the victim's allegations did not generate any reasonable doubt in the mind of any juror. Regardless of the outcome, after considering all of the issues and evidence, the court is not persuaded that trial counsel's representation "fell below an objective standard of reasonableness" or was otherwise constitutionally ineffective.

[¶33] Indeed, the evidence in the record shows that the jury found Watson guilty on all charges. Because the State's case relied exclusively on the victim's testimony, the guilty verdicts necessarily reflected a finding by the jury that the victim was credible. *See State v. Drewry*, 2008 ME 76, ¶ 32, 946 A.2d 981 ("A victim's testimony, by itself, is sufficient to support a guilty verdict for a sex crime . . . if the testimony addresses each element of the crime and is not inherently incredible." (alteration omitted) (quotation marks omitted)).

[¶34] Moreover, in trial counsel's opening statement, he explained to the jury, "[W]e believe this case comes down to the credibility of the witnesses. In assessing [the victim]'s credibility, we'd ask that you keep a careful ear out for what she testifies to you today compared to . . . what she's told people in the past." Trial counsel put the jury on notice that this case hinged on the victim's

credibility, asked the jury to be mindful of how her testimony may be inconsistent, and then presented to the jury a video of the victim's *consistent* statements regarding the alleged sexual assault. This bolstered the victim's credibility and prejudiced Watson.

[¶35] In *People v. Douglas*, the Supreme Court of Michigan was presented with similar facts in a direct appeal. 852 N.W.2d 587, 590-92 (Mich. 2014). Although the Michigan court was not reviewing prejudice in the context of a *Strickland* analysis, it considered the prejudicial effect of a video-recorded interview that was consistent with the victim's trial testimony. *See id.* at 596-601. Douglas was convicted by a jury of criminal sexual conduct arising from his young daughter's allegations of two instances of sexual abuse. *Id*. at 590. The court concluded that the trial court abused its discretion by admitting into evidence the victim's out-of-court statements, which already came into evidence through witness testimony, by allowing the prosecution to "close[] its case in chief by showing the jury the video recording of [the victim's] forensic interview." *Id*. at 592-93, 595. The Michigan court considered whether the error in admitting the video was prejudicial. *See id* at 599-601. It explained:

> This case presented the jury with a pure credibility contest; there were no third-party witnesses to either instance of alleged abuse, nor any physical evidence of it. As such, the prosecution's case hinged heavily on [the victim]'s credibility in her accounts of the

> alleged abuse . . . . With regard to the alleged [instance of abuse], the only accounts properly before the jury were [the victim]'s testimony at trial, and [her mother]'s testimony regarding [the victim]'s prior disclosure of it to her. The credibility of these accounts, and [the mother]'s motives and influence in connection with them, were the focus of the defense and a central issue at trial. As a result of the court's error, however, the prosecution was not limited to this evidence, and instead the jury was permitted to hear from [the victim] . . . again through the video recording of [her] forensic interview.

*Id.* at 599-600 (footnotes omitted). The court concluded that "[t]he resulting prejudice is unsurprising." *Id.* at 601. It held that the defendant was entitled to a new trial because the "[victim]'s erroneously admitted statements during the forensic interview more probably than not tipped the scales against the defendant such that the reliability of the verdict against him was undermined." *Id.* (quotation marks omitted).

[¶36] The record in this case compels a finding that the jury's verdict was grounded in its determination of the victim's credibility. Further, as in *Douglas*, the victim's credibility and motives for the allegations "were the focus of the defense and a central issue at [Watson's] trial." *Id.* at 600. There was no corroborating evidence of the instances of sexual abuse to bolster the testimony of this ten-year-old victim; it was the victim's testimony that supported the jury's verdict.

[¶37]  Unlike in *Douglas*, however, the video of the forensic interview in this case was introduced by Watson's defense attorney—a decision that we hold was manifestly unreasonable.  It follows that, but for this unreasonable decision, "there is a reasonable probability that 'the result of the proceeding would have been different.'"  *Ford*, 2019 ME 47, ¶ 20, 205 A.3d 896 (quoting *Strickland*, 466 U.S. at 694).

[¶38]  Given trial counsel's deficient conduct, it is clear that that the defendant was adversely affected by introduction of the video-recorded interview at the end of the jury trial along with the transcript of the video supplied to the jurors for their deliberations.  Trial counsel's actions "rose to the level of compromising the reliability of [Watson's] conviction and undermining confidence in it." *See Philbrook*, 2017 ME 162, ¶ 8, 167 A.3d 1266.

## III.  CONCLUSION

[¶39]  The court erred when it denied Watson's petition for post-conviction relief.  As a result of trial counsel's deficient performance, Watson was prejudiced in his attempt to defend against all charges brought against him, entitling him to post-conviction relief from judgment of conviction on all counts.

The entry is:

> Judgment vacated. Remanded for entry of a judgment granting the petition for post-conviction review and vacating all convictions in the underlying criminal judgment.

_____

David Paris, Esq. (orally), Bath, for appellant Richard Watson

Joshua K. Saucier, Asst. Dist. Atty., and Mark A. Rucci, Asst. Dist. Atty. (orally), Prosecutorial District V, Bangor, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2017-1320
FOR CLERK REFERENCE ONLY