STATE OF MAINE                    UNIFIED CRIMINAL DOCKET
CUMBERLAND, ss.                   DOCKET NO. CUMCD-CR-22-1145


MARK CARDILLI JR.,                )
                                  )
          Petitioner,             )
                                  )
     v.                           )    ORDER ON PETITION FOR
                                  )    POST-CONVICTION REVIEW
STATE OF MAINE,                   )
                                  )
          Respondent.             )


Before the Court is Petitioner Mark Cardilli Jr.'s request for Post-Conviction

Review (PCR) pursuant to 15 M.R.S. §§ 2121-2132.

## PRELIMINARY STATEMENT

At the outset, this court notes that this is one of the most challenging cases in

its career. A PCR hearing is not a retrial of the underlying case but rather an

evaluation of whether a defendant's right under the 6th Amendment to the United

States Constitution to adequate legal representation has been violated.

The nature of the relatively small Maine legal community means that it is

inevitable that a PCR judge will be required to evaluate the performance of lawyers

who routinely appear in front of that judge. This court has had multiple cases with

trial counsel in this case, Attorney Matthew Nichols and then-Attorney Churchill,

including complicated and difficult high-profile cases. Their performance in those

1

cases was exemplary. They have both earned outstanding reputations in the criminal defense bar.

The next challenge is that Attorney Churchill is now a Maine District Court Judge.[1] and a professional colleague of this court. I agreed to accept assignment in this case because I sit in the Superior Court, not the District Court, and I am assigned to a different judicial region. As a result, I have no day-to-day professional interactions with Judge Churchill. I also have no social interaction with Judge Churchill outside of occasional judicial trainings and meetings. Accordingly, I feel I can appropriately and impartially evaluate the defense of Mr. Cardilli during his murder trial.

Finally, it is routine for a PCR to be assigned to the judge who heard the trial. That judge has seen the witnesses in person and has a greater understanding of the trial dynamics apart from simply reading a voluminous transcript. The trial judge who decided this matter was Superior Court Justice Nancy Mills. Justice Mills is now in active-retired judicial status. Although that would not have precluded assignment of this case to her, one of the claims advanced by Mr. Cardilli is that he waived his right to a jury trial in favor of a bench trial with Justice Mills because of representations by Attorney Nichols that led Mr. Cardilli to believe that Justice Mills

---

[1] As this case relates to Judge Churchill's role at the trial in this case in her prior career as an attorney, she shall be referred to as Attorney Churchill in this decision.

2

would be inclined to rule in his favor based on a personal relationship between Attorney Nichols' family and Justice Mills. This court concludes that this allegation is meritless for reasons discussed below. However, the nature of these allegations made assignment to another judge necessary.

## PROCEDURAL BACKGROUND

By indictment dated April 5, 2019, Mr. Cardilli was charged with the intentional and knowing murder of Ishak Muse, in violation of 17-A M.R.S. section 201(A). The Superior Court (Cumberland County, *Mills, J.*) held a bench trial from December 9 through December 13, 2019. On December 27, 2019, the court issued a Judgment, finding Mr. Cardilli not guilty of intentional and knowing murder but guilty of manslaughter with a dangerous weapon in violation of section 203(1)(A). *State v. Cardilli*, No. CUMCD-CR-2019-01823 Unified Criminal Docket (Cumberland Cnty., Dec. 27, 2019). On August 31, 2020, the trial court imposed a sentence of 11 years in prison, all but seven and a half years suspended, and four years of probation. Mr. Cardilli timely appealed on September 1, 2020. The Law Court affirmed the judgment of conviction on June 17, 2021. *State v. Cardilli*, 2021 ME 31, 254 A.3d 415.

On June 24, 2021, Mr. Cardilli filed a Motion to Reconsider and Recall the Mandate. The Law Court denied the motion. On April 1, 2022, Mr. Cardilli filed the instant petition for post-conviction review, claiming ineffective assistance of trial

3

counsel. Mr. Cardilli alleges that he was deprived of a fair trial because trial counsel (1) failed to present a self-defense justification under 17-A M.R.S. section 108(2)(A), (2) improperly counseled Mr. Cardilli into waiving his right to a jury trial, and (3) misunderstood the law of justification under section 101(3).

## FACTUAL BACKGROUND

In March 2019, Mr. Cardilli returned to Portland after five years of Army service and began living in his family home with his parents and his seventeen-year-old sister.[2] At that time, his sister was under bail conditions of no contact with her twenty-two-year-old boyfriend, Ishak Muse. On March 15, 2019, Mr. Cardilli's sister ignored bail conditions and invited Mr. Muse to come over to the house. Mr. Muse arrived at 10:00 p.m., and after a family argument over his presence, Mr. Cardilli's parents agreed to allow Mr. Muse to stay until 1:00 a.m.

At 1:00 a.m., Mr. Muse refused to leave, and another family argument began. This time, Mr. Cardilli's parents held firm and continued to tell Mr. Muse to leave. When he refused, Mr. Cardilli and his father escorted Mr. Muse to the door to a breezeway and tried to make him leave, but Mr. Muse pushed them off and forced his way back into the kitchen. At this point, the altercation became physical, with

---

[2] As the facts of this case have been thoroughly set forth in *State v. Cardilli*, 2021 ME 31, 254 A.3d 415, this court provides only a brief recitation of essential facts.

Mr. Cardilli's sister hitting her family members and Mr. Muse attempting to punch Mr. Cardilli. Mr. Cardilli went to his bedroom to grab his gun.

When Mr. Cardilli returned to the kitchen, he pointed the gun at Mr. Muse and again told him to leave. Mr. Muse did not leave, but instead began hitting Mr. Cardilli. Mr. Muse punched Mr. Cardilli in the face several times while Mr. Cardilli retreated with the gun at his side. As Mr. Muse went to punch him again, Mr. Cardilli raised the gun and shot three times; the first shot grazed Mr. Muse's hand and brow and the second and third hit his torso. The shooting occurred at approximately 1:43 a.m. Mr. Cardilli called the police to report the shooting. Emergency responders confirmed Mr. Muse dead on the scene.

## DISCUSSION

A criminal defendant's right to the effective assistance of an attorney is protected by the 6th Amendment to the United States Constitution and article I, section 6 of the Maine Constitution. *Watson v. State*, 2020 ME 51, ¶ 17, 230 A.3d 6. On post-conviction review, claims of ineffective assistance of counsel are analyzed under the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "errors of counsel . . . actually had an adverse effect on the defense." *Theriault v. State*, 2015 ME 137, ¶ 14, 125 A.3d 1163 (quoting *Strickland*, 466 U.S. at 693).

5

Under the first prong of the *Strickland* test, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Watson*, 2020 ME 51, ¶ 19, 230 A.3d 6. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* (quoting *Strickland*, 466 U.S. at 688). The Law Court has clarified that "counsel's representation of a defendant falls below the objective standard of reasonableness if it falls 'below what might be expected from an ordinary fallible attorney.'" *Philbrook v. State*, 2017 ME 162, ¶ 7, 167 A.3d 1266 (quoting *Francis v. State*, 2007 ME 148, ¶ 4, 938 A.2d 10).

Under the second prong of the *Strickland* test, the petitioner must prove that counsel's errors "actually had an adverse effect on the defense." *Watson*, 2020 ME 51, ¶ 29, 230 A.3d 6 (quoting *Ford v. State*, 2019 ME 47, ¶ 11, 205 A.3d 896. This is not a quantitative inquiry, but a qualitative one. *Theriault*, 2015 ME 137, ¶ 19, 125 A.3d 1163. The Court must "determine whether the petitioner has demonstrated that trial counsel's performance undermines confidence in the outcome of the case and renders that outcome unreliable." *Id.*

## I. Failure to Present 17-A M.R.S. § 108(2)(A) Defense

Mr. Cardilli first argues that trial counsel was ineffective in failing to present a self-defense justification pursuant to 17-A M.R.S. section 108(2)(A). In a murder trial, it is the State's burden to prove beyond a reasonable doubt that "(1) the victim

is dead; (2) the defendant caused his death; (3) the defendant's conduct was voluntary; and (4) the defendant acted knowingly or intentionally." *State v. Jeskey*, 2016 ME 134, ¶ 31, 146 A.3d 127. If the defendant pursues a self-defense justification, he "bears the burden of production to generate the issue with sufficient evidence." *State v. Herzog*, 2012 ME 73, ¶ 8, 44 A.3d 307. The burden then shifts back to the State to disprove the defense. *Id.*

Section 108(2)(A) provides:

2. A person is justified in using deadly force upon another person:

A. When the person reasonably believes it necessary and reasonably believes such other person is:

(1) About to use unlawful, deadly force against the person or a 3rd person[.]

Mr. Cardilli contends that trial counsel failed to argue self-defense under section 108(2)(A) at trial, and that trial counsel's failure to make that argument constitutes ineffective assistance of counsel. The court will begin by outlining relevant evidence from the PCR hearing and then move on to a *Strickland* analysis.

## A.   Evidence at PCR Hearing

As stated above, Mr. Cardilli was represented at trial by Attorney Nichols and Attorney Churchill, both of whom testified at the PCR hearing. Mr. Cardilli also presented the testimony of two expert witnesses, Associate Professor Thea Johnson

7

of Rutgers University Law School, and Thomas Aveni, Executive Director of Police Policy Studies Council.

### Then-Attorney Churchill

Then- Attorney Churchill testified that self-defense under section 108(2)(A) was not presented at trial because there did not appear to be imminent use of deadly force by Mr. Muse that would have justified that defense. (Tr.1. 174: 8-14; 175:10-14.) In her recollection, the only defenses presented at trial were: (1) defense of premises under section 104(3),[3] and (2) self-defense under section 108(2)(B).[4] (Tr.1.

---

[3] 17-A M.R.S. § 104(3) provides:

3. A person in possession or control of a dwelling place or a person who is licensed or privileged to be therein is justified in using deadly force upon another person:

   A. Under the circumstances enumerated in section 108; or

   B. When the person reasonably believes that deadly force is necessary to prevent or terminate the commission of a criminal trespass by such other person, who the person reasonably believes:

      (1) Has entered or is attempting to enter the dwelling place or has surreptitiously remained within the dwelling place without a license or privilege to do so; and

      (2) Is committing or is likely to commit some other crime within the dwelling place.

[4] 17-A M.R.S. § 108(2)(B) provides:

2. A person is justified in using deadly force upon another person . . .

   B. When the person reasonably believes:

      (1) That such other person has entered or is attempting to enter a dwelling place or has surreptitiously remained within a dwelling place without a license or privilege to do so; and

8

175:1-12.) She testified that the focus of the defense strategy was proving that Mr. Muse had "surreptitiously remained" in the Cardilli house. (Tr.1. 180:5-8.) Consistent with that view of trial strategy, Judge Churchill testified that she excluded self-defense under section 108(2)(A) when she wrote the written closing argument, which she agreed states: "This is not a self-defense case under [section] 108(2)(A) where the court needs to determine whether Mr. Muse was going to inflict deadly force on any of the inhabitants of [the Cardilli household]." (Pet'r Ex. 20.)

Attorney Nichols

Attorney Nichols testified that trial counsel pursued a two-prong defense: (1) use of force in defense of property under section 104(3), and (2) self-defense under section 108(2) "in its entirety," including both (A) defense against a person who is about to use unlawful deadly force, and (B) defense against a person who has surreptitiously remained in a dwelling place. (Tr.1. 38:13-15.) He stated that surreptitious was the "keyword" of the defense (Tr.1. 25:1-2), but that self-defense under section 108(2)(A) was also argued throughout the trial and in his oral closing. (Tr.1. 28:22-29:5; 36:3-5.)

Attorney Nichols further testified that the division of trial work was such that he did most of the examinations and Attorney Churchill was responsible for the

_____

(2) That deadly force is necessary to prevent the infliction of bodily injury by such other person upon the person or a 3rd person present in the dwelling place[.]

9

research and writing. (Tr.1. 33:12-18.) He stated that Attorney Churchill wrote the written closing argument and signed it for him, in his name. (Tr.1 29:21-25.) Attorney Nichols testified that he did not read the written closing argument and was unaware that self-defense under section 108(2)(A) had been excluded from the trial court's consideration until he read the June 2021 Law Court opinion. (Tr.1. 29:23-30:16.)

### Mr. Cardilli

Mr. Cardilli testified that he discussed with trial counsel his fear of suffering death or serious bodily injury during the altercation with Mr. Muse, stating as follows:

> I told everyone that [sic] I feared that a punch could kill me. And if it wasn't the punch itself that'd kill me, being knocked out, having him take the weapon from me, and turn it on my family, my ailing, now deceased father, or myself would be what would happen.

(Tr.1. 215: 14-19.) Although he was unable to pinpoint exactly when these conversations with trial counsel took place, Mr. Cardilli testified that he frequently discussed his fears of death or serious bodily injury with Attorney Nichols. (Tr.1 218:3-11.)

### Professor Thea Johnson

Professor Johnson is currently an Associate Professor of Law at Rutgers Law School. She has also taught at the University of Maine School of Law and Stanford

10

Law School. Her professional experiences include working as a staff attorney at the Federal Defenders of New York litigating habeas corpus petitions as well as serving as a staff attorney in the Criminal Defense Division of the Legal Aid Society of New York. In her work at the Legal Aid Society, she handled an active caseload of criminal defense matters and served as a faculty member in the training program for New York City public defenders.

Professor Johnson testified that self-defense under section 108(2)(A) was generated by the evidence and should have been presented at trial. (Tr.2. 41:13-18.) She referenced evidence demonstrating that Mr. Cardilli was assaulted, that he felt fear, and that there was a "very violent chaotic scene." (Tr.2. 41:20-25.) In her view, "there was never any full-throated embrace of" self-defense under section 108(2)(A) at trial. (Tr.2. 42:3-4.) She acknowledged that Attorney Nichols stated once in oral closing that Mr. Cardilli was in fear of his life, but she clarified that he did not present any legal argument in relation to that statement (Tr.2. 42: 5-13), and that "there was an absolute failure to argue that point" in the written closing. (Tr.2. 42:14-15.)

Professor Johnson also testified that trial counsel's "surreptitiously remained" defense was not strong, noting that there was no "groundswell of caselaw that supported their particular argument," and that nothing in the writing closing "indicated that surreptitious had a particular meaning that covered this scenario," where Mr. Muse "was invited to the house and everyone knew he was in the house."

11

(Tr.2. 38:2-39:7.) She opined that "it was reasonable to make the argument that surreptitious could also include that [Mr. Muse] was hiding in the room and had been told to leave," but that there was not "some obvious point of law" in support of that argument. (Tr.2. 39:9-14.)

Professor Johnson was also "particularly concerned . . . that co-counsel had conflicting views of the strategy." (Tr.2. 43:9-116.) She testified that, to the extent that there was a division of labor between trial counsel, any such division must "have harmony to it in which [co-counsel] are on the same page about what the strategy is." (Tr.2. 43:17-24.) Ultimately, it is Professor Johnson's opinion that trial counsel's representation "certainly [fell] below prevailing professional norms in a murder case." (Tr.2. 43:25-44:4.) This court finds Professor Johnson's testimony and opinions credible and persuasive on the self-defense issues set forth in this section.

Thomas Aveni

Mr. Aveni is a former state and local law enforcement officer who is the Executive Director and Co -Founder of the Police Policy Studies Council. He has been the lead instructor at nationally presented seminars on the appropriate use of deadly force. He is a certified police trainer and has trained over 15,000 police, security and military personnel from the United States and 23 other countries.

Mr. Aveni testified the evidence presented at trial supported a self-defense justification for the use of deadly force in defense of a person. When discussing the level of threat posed by Mr. Muse, Mr. Aveni referenced the differences between Mr. Muse and Mr. Cardilli in terms of size, stating that because Mr. Muse was taller and heavier, he could "throw punches with near impunity." (Tr.2. 87:9-21.) In Mr. Aveni's opinion, that created a more dangerous situation for Mr. Cardilli, as the smaller person. (Tr.2. 88:1-6.) Mr. Aveni also noted that Mr. Cardilli took repeated blows to the head from Mr. Muse. (Tr.2. 97:13-17.)

When discussing Mr. Cardilli's use of force, Mr. Aveni called attention to the following evidence introduced at trial: the encounter escalated quickly, morphing from a verbal dispute to a physical confrontation (Tr.2. 86:11-12; 99:22-24); Mr. Cardilli witnessed his parents being assaulted (Tr.2. 103:23-24); Mr. Cardilli was himself assaulted (Tr.2. 103:25-104:2); throughout the assault on his person, Mr. Cardilli was retreating with the gun held at his side (Tr.2. 93:5-11); and, at the moment of the shooting, Mr. Cardilli had been backed into the wall. (Tr.2. 95:13-24.) Mr. Aveni explained that, in his opinion, "the fact that [Mr. Cardilli] had a gun, took a beating, kept retreating, and didn't use the gun until he thought he had to," demonstrated that Mr. Cardilli exercised considerable restraint in the encounter. (Tr.2. 92:3-15; 103:21-104:7.) Mr. Aveni placed little weight on the fact that Mr.

13

Muse did not have a weapon of his own, stating: "if someone is on top of you beating you senselessly, your gun is his gun." (Tr.2. 100:8-16.)

The court also finds Mr. Aveni's opinions persuasive to the extent that these were arguments available to the defense and needed to be more vigorously advocated at trial and not waived in a written closing argument. This court is not able to draw any conclusion about whether such arguments would be accepted by a factfinder, only that they were available to the defense team who were experienced criminal defense lawyers.

## B.    Performance

Mr. Cardilli has demonstrated that his attorneys did not have a cohesive trial strategy. It is clear from the testimony presented at the PCR hearing that trial counsel had opposing views as to whether self-defense under section 108(2)(A) was part of Mr. Cardilli's defense. The fact that trial counsel were unaware of the disharmony between their two strategies at the time of trial evidences a significant breakdown of communication. In any criminal case, but especially in a murder case, it is unquestionable that counsel must have a clear trial strategy.

Further, there is some record evidence before the court to support Mr. Cardilli's assertion that self-defense under section 108(2)(A) was not presented effectively at trial, despite having been generated by the evidence. The trial transcripts indicate that Mr. Cardilli's fears of death or bodily injury were not

14

thoroughly explored on direct examination. While evidence on direct was adduced from Cardilli that he had been punched at least ten times in the nose and that in response to Cardilli saying he would not shoot, Muse responded "shoot or kill me, I want to die", it was only briefly inquired on redirect about Cardilli's fear of losing the gun and fear of death. (Bench Trial TR2 p 782-784, 832.) Further, although Attorney Nichols did state at the end of his oral closing that it was reasonable for Mr. Cardilli to fear for his life, the oral closing overall was more tailored to the argument that Mr. Muse had surreptitiously remained in the house.

Finally, the written closing argument specifically instructs the trial court that it need not consider self-defense under section 108(2)(A) when reaching its decision. Attorney Nichols concedes that, although he was lead counsel in this case, he did not read the written closing argument and was unaware of its contents. Attorney Nichols acknowledges that he did not intend to waive a 108(2)(A) defense and that 108(2)(A) was part of his defense strategy. However, in the words of the Law Court:

> The record clearly shows that Cardilli not only failed to request a self-defense justification pursuance to section 108(2)(A), but explicitly argued that the evidence did not generate the self-defense justification. He argued in a written memorandum in support of closing, "This is not a self-defense case under [section] 108(2)(A) where the [c]ourt needs to determine whether [Muse] was going to inflict deadly force on any of the inhabitants of [the Cardilli home]." Further, even though he asked the court to reconsider some of its rulings, Cardilli never suggested that the self-defense justification provided by section 108(2)(A) had any application.

*Cardilli*, 2021 ME 31, ¶ 34, 254 A.3d 415.

15

After due consideration of these errors, the court finds that trial counsel's performance fell below the objective standard of reasonableness. As noted above, the court is especially persuaded by Professor Johnson's opinion that trial counsel's performance on the self-defense issue fell below prevailing professional norms.

## C. Prejudice

This court is now tasked with evaluating the integrity of the decision-making process, in terms of whether arguments were made as vigorously as required and whether the waiver of any such arguments affected the decision-making process of another judge. In *Niehoff v. Shankman & Assocs. Legal Ctr., P.A.*, the Law Court evaluated arguments about proximate causation in a legal malpractice case where an argument had not been made. 2000 ME 214, ¶ 9, 763 A.2d 121. It indicated that, even in a civil matter, few results from a factfinder can be predicted, even on a more likely than not standard. That same difficulty, by analogy, exists here under the higher criminal standard of proof beyond a reasonable doubt.

As noted in *Theriault*, the prejudice test is not outcome determinative. 2015 ME 137, ¶ 20, 125 A.3d 1163. *Niehoff* illustrates, even in a civil context, the extreme difficulty of attempting to predict how the absence of an argument would affect a factfinder's conclusions. 2000 ME 214, ¶ 9, 763 A.2d 121. Thus, the court is not

required to find that, had trial counsel argued self-defense under section 108(2)(A), the outcome of the case would more likely than not have been different. *Theriault*, 2015 ME 137, ¶ 20, 125 A.3d 1163 ("[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome" (quoting *Strickland*, 466 U.S. at 694)). Rather, the court must determine whether trial counsel's errors "compromis[ed] the reliability of the conviction and undermin[ed] confidence in it." *Id.* ¶ 25.

As discussed above, the evidence before the court demonstrates that trial counsel failed to have a cohesive trial strategy, did not vigorously argue self-defense under section 108(2)(A) at trial, and explicitly advised the trial court that it need not consider 108(2)(A) in its analysis. These failures call into question the fairness and integrity of the trial court proceedings. While the court cannot say that, absent these failures, it is more likely than not that the outcome would have been different, neither can it have confidence in the conviction.

Put another way, parties submit motions for a reason. Parties argue orally and in writing before the court for a reason. These practices are not extraneous to the court's decision-making process. Here, not only did the trial court lack the benefit of effective argument on self-defense under section 108(2)(A), but it was also explicitly advised to disregard that defense. This court cannot speculate as to how

17

that fact might have affected the trial court's conclusion that Mr. Cardilli believed deadly force was necessary but that his belief was objectively unreasonable, thereby implicating imperfect self-defense and reducing murder to manslaughter. In other words, the trial court may have been influenced on some level that Mr. Cardilli's belief that deadly force was necessary was unreasonable *because of* the statement in his written closing argument that deadly force was not justified under 108(2)(A).

In her decision, Justice Mills did a thorough and exhaustive review of the evidence and arguments presented. She did not decide the case from the bench but took the matter under advisement and requested the guidance of written closing arguments. The written closing argument indicated self-defense under section 108(2)(A) was not generated by the facts of the case.

A review of Justice Mill's decision indicates that while she did an in-depth self-defense analysis with respect to the portions of self-defense that were raised in the written closing arguments, she did not address or analyze section 108(2)(A). It is reasonable to conclude this was due to the express written waiver of that argument. In the request for additional findings of fact and conclusions of law, Justice Mills also addressed the self-defense arguments made in written closing argument but once again did not address or analyze the applicability of 108(2)(A). Once again, this may have likely been because of the written closing argument waiver of that defense.

The Law Court did note that the facts that were found by Justice Mills would not have supported a 108(2)(A) defense:

> Even if we were to assume that Cardilli's section 108(2)(A) argument was not expressly waived, we find it unpersuasive. The court's findings regarding the level of "threat" posed by Muse preclude a finding that Cardilli held an objectively reasonable belief that Muse was about to use unlawful, deadly force against anyone in the household. As mentioned above, the court explicitly found that Muse was not armed and that he did not at any time try to grab Cardilli's gun. The court specifically found that Muse's response to seeing the gun was to ask for his phone so he could call for a ride home. Even if Cardilli had an actual belief that Muse was about to use deadly force by taking control of the gun that Cardilli brought into the chaos—a belief not asserted by Cardilli at trial—the court found that any such belief was objectively unreasonable. The court aptly noted that "Muse had been drinking all day on March 15, 2019 and was impaired. Deadly force was not required to prevent minimal bodily injury or to remove...Muse from the house."

*Cardilli*, 2021 ME 31, ¶ 35, 254 A.3d 415. However, on post-conviction review, where there has been a finding that Mr. Cardilli's representation was deficient, the issue is not whether the outcome of the case would have been different if trial counsel had argued 108(2)(A), but rather, whether the integrity of the proceedings, including the factfinding process, were affected by their failure to do so.

A thorough review of the trial transcripts indicates that Mr. Cardilli did, *in fact*, assert at trial his fear, that after repeated blows to the nose and face, being backed up against a wall with no retreat, and being told by Mr. Muse, "shoot me or

19

kill me, I want to die" [5] that Mr. Muse would take the gun from him, stating: "The reason why I shot was I feared, not knowing how many more punches I could take, and if I dropped the gun, lost the gun, Mr. Muse would take it and turn it on me and my family." (Bench Trial Tr.2. 832:7-10.) Given that Mr. Cardilli testified to his fear that deadly force would be used against him, and that Attorney Nichols referenced that fear in his oral closing argument, it is even more concerning that the issue was waived in the written closing argument.

Analyzing the prejudice prong in this case is especially difficult. The written closing argument indicated that this was not a case where the court needed to consider whether deadly force was about to be utilized against a person. As discussed by the Law Court, this was a waiver of that defense at trial. However, the court concludes that this written argument was inconsistent with what Mr. Cardilli reported to his lawyers and what he testified to at trial. Further, Mr. Cardilli did indicate to Justice Mills that he feared Mr. Muse would use deadly force against him. (Bench Trial Tr.2. 815:8-10; 832:7-10.) As the Law Court noted, Justice Mills' decision included factual findings that would not have supported a 108(2)(A) defense even if it had been raised. What is more difficult for this court to analyze is whether the written closing argument affected that factfinding process.

---

[5] This allegedly was said by Mr. Muse after Cardilli said I do not want to shoot you. ( Bench Trial TR.2 p.782 )

Justice Mills it is one of the most respected trial jurists in Maine. This court would not presume to attempt to analyze her fact -finding process and, in fact, to do so would be pure speculation. When juries are instructed as to how to conduct the fact -finding process and determine credibility, it is routine for them to be told that that process involves the use of their common sense and life experiences and can include their evaluation of the way witnesses behaved on the stand and whether they appeared forthright or evasive. These decisions are individualized and subjective to the fact finder, whether it be a juror or a judge.

All this court can do in terms of analyzing the integrity of the of the trial process is determine whether Mr. Cardilli received a fair defense under *Strickland*.

Cardilli testified that he was not sure how many more blows he could take and that if he lost the gun and he feared Mr. Muse would use the gun against him or his family. Attorney Nichols argued orally that this belief was reasonable. When the written closing argument contradicted those things there was a risk that not only did it affect a waiver of the argument but potentially an assessment of the credibility of Mr. Cardilli. This especially true when one considers that the law of self-defense does not place the ultimate burden on the Defendant but rather that once generated , the State must disprove it with proof beyond a reasonable doubt.

Given Mr. Cardilli 's testimony on redirect at trial that he feared for his life, if this court was deciding the trial, it would be concerned that the contradictory waiver might have affected its analysis of the evidence.[6] These specific concerns would be that (1) the contradiction of his belief in written closing argument by his lawyer might have affected this court's analysis of the validity and credibility of his belief, (2) affected the evaluation of the credibility of the remainder of his testimony and (3) the assessment of all the other testimony and evidence that was inconsistent with his testimony.

Once again, this court cannot and does not speculate on what effect this contradiction might have had on Justice Mills' analysis.[7]

However, given this court's trepidation that the written closing argument might have affected its own factfinding judgment, and the fact that 108(A)(2) self-defense was never specifically addressed in the judgment, this requires the court to conclude that Mr. Cardilli has satisfied the prejudice prong of *Strickland.*

---

[6] This court is well aware that opening and closing statements are not evidence. However, as *Field and Murray, Maine Evidence, 6th edition. Section 801.7* apply notes, a statement made by a lawyer on behalf of a client can be construed as an admission by authorization. That is ordinarily only admissible when offered by an opposing party because an admission must be contrary to a party's position at trial. Here, while the statement was not offered by a party opponent, it was contrary to Mr. Cardilli 's trial testimony. Even if this is technically not evidence ,this court can see how that could have affected the fact finding process apart from simply being a legal waiver of argument.

[7] In bench trials this court routinely asks for the aid of written closing memoranda. Those memoranda are usually more detailed than oral closing arguments due to time constraints. This court views those as complementary to oral closing arguments. Without there being something specifically highlighted in a written closing memorandum , it would be highly unusual to become concerned a party's written closing argument was contradictory to the preceding oral one.

22

For these reasons, the court finds that Mr. Cardilli was prejudiced by trial counsel's failure to present a 108(2)(A) justification.

## II. Waiver of Jury Trial Right

Mr. Cardilli next argues that his right to a jury trial was not knowingly and intelligently made but was instead induced by the improper conduct of trial counsel. The Maine Constitution guarantees the right to a jury trial in all criminal prosecutions. Me. Const. art. I, § 6. Waiver of the right to a jury trial must be both voluntary and intelligent. *State v. Ouellette*, 2006 ME 81, ¶ 12, 901 A.2d 800. Here, Mr. Cardilli contends that his conversations with Attorney Nichols led him to believe that certain outcomes were guaranteed.

### A. Evidence at PCR Hearing

At the PCR hearing, Mr. Cardilli testified that Attorney Nichols advised him that, due to the racial aspects of the case, a Cumberland County jury would never acquit him. (Tr.1. 205:25-206:20.) Attorney Nichols testified that although he and Mr. Cardilli did discuss the impact that the current political climate, including the ongoing Black Lives Matter movement, could have on jury selection, they also discussed the emotional nature of the case, the likelihood that Justice Mills would be better able to apply the law to the facts than would 12 jurors, and a host of other considerations. (Tr.1. 91:20-92:14.) Attorney Nichols testified that all of these factors combined led him to recommend that Mr. Cardilli waive his right to a jury

23

trial, while still making clear that the ultimate decision was Mr. Cardilli's alone. (Tr.1. 97: 14-24.)

Mr. Cardilli further testified that his conversations with Attorney Nichols led him to believe that if he were to waive his right to a jury trial in favor of a bench trial before Justice Mills, that "it was going to work out" for him (Tr.1 192:1-11), and that the bench trial itself would simply be "going through the motions." (Tr.1. 202:3-5.) Testimony from the PCR hearing suggests that Attorney Nichols told a brief anecdote that may have resulted in Mr. Cardilli and his mother forming the impression that Attorney Nichols had a personal or familial relationship with Justice Mills where no such relationship in fact existed. (Tr.1. 95:4-95:12.)

## B. Performance

Attorney Nichols made a strategic decision in advising Mr. Cardilli to waive his right to a jury trial. Strategic decisions by trial counsel deserve significant deference and will not justify vacating a conviction unless they were "manifestly unreasonable." *Theriault*, 2015 ME 137, ¶ 65, 125 A.3d 1163 (Alexander, J., dissenting) (quoting *Pineo v. State*, 2006 ME 119, ¶ 13, 908 A.2d 632). Attorney Nichols discussed a range of important and proper considerations with Mr. Cardilli, and although he strongly advised Mr. Cardilli to waive his right to a jury trial, he ultimately left the decision in Mr. Cardilli's hands.

24

Further, although attorneys should generally take care to avoid sharing stories that could be construed to denote any kind of special relationship with the court, the court credits Attorney Nichols' recollection of the anecdote and the circumstances associated with it . Because the court has found that trial counsel's performance was not deficient in this regard, no prejudice analysis is needed. *Strickland*, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one").

## III.   Law of Justification

Finally, Mr. Cardilli argues that it was ineffective for trial counsel to have misunderstood the standard for imperfect self-defense. Under section 101(3), the State need only prove that a defendant's actual beliefs related to the self-defense justification were not reasonable.[8] Trial counsel relied on an earlier version of the statute, which required the State to prove that the defendant's beliefs grossly deviated from what a reasonable person would believe in the same or similar situation. *See* P.L. 2007, ch. 475, § 10 (effective June 30, 2008); *Cardilli*, 2021 ME

---

[8] 17-A M.R.S. § 101(3) provides:

3. Conduct that is justifiable under this chapter constitutes a defense to any crime; except that, if a person is justified in using force against another, but the person recklessly injures or creates a risk of injury to 3rd persons, the justification afforded by this chapter is unavailable in a prosecution for such recklessness. If a defense provided under this chapter is precluded solely because the requirement that the person's belief be reasonable has not been met, the person may be convicted only of a crime for which recklessness or criminal negligence suffices.

25

31, ¶¶ 16-17, 254 A.3d 415. Mr. Cardilli argues that, had trial counsel accurately explained the standard to him, it would have impacted his decisions regarding plea offers, jury trial waiver, trial evidence, and trial arguments.

## A. Evidence at PCR Hearing

Mr. Cardilli testified that around November of 2019, there was a conversation wherein trial counsel advised him of the gross deviation standard and explained that the burden would be on the State to prove that the standard was met. (Tr.1. 204:3-6; 205:12-24.) This conflicts with the testimony of Attorney Nichols, who stated unequivocally that trial counsel did not discuss the gross deviation standard with Mr. Cardilli during that conversation, or at any time, and that the words gross deviation "were never mentioned" to Mr. Cardilli. (Tr.1. 106:12-20.) Judge Churchill could not recall whether the gross deviation standard was discussed with Mr. Cardilli, but she testified that her usual practice was to follow the statute book while speaking with clients, and in that case, the term gross deviation would not have been uttered. (Tr.1. 179:24-180:15.)

Attorney Nichols further testified that Mr. Cardilli "had zero interest in [sic] pleading guilty to manslaughter under any conditions," regardless of what the possible sentence might be. (Tr.1. 151:17-23; 152:23-153:6; Tr.2. 130:7-10.) When asked on the stand, Mr. Cardilli was unwilling to say whether he would have been

willing to plead guilty to manslaughter, had he known the correct standard. (Tr.2. 6:1-5.)

## B. Prejudice

Based on the testimony provided, the Court is inclined to credit Attorney Nichols' memory that the gross deviation standard was not discussed with Mr. Cardilli and therefore could not have affected any of his decisions. However, even if that standard had been discussed, other evidence presented at the PCR hearing suggests that Mr. Cardilli would not have accepted any plea related to manslaughter. Further, the alleged conversation regarding the gross deviation standard occurred after Mr. Cardilli waived his right to a jury trial on October 16, 2019, eliminating any possibility that his decision to waive that right was impacted by trial counsel's misapprehension.

Finally, given that the trial court first found Mr. Cardilli guilty under the correct standard of reasonableness, Mr. Cardilli was not prejudiced by trial counsel's success in convincing the trial court to also consider the case under the older, more favorable standard. Because the court finds that Mr. Cardilli was not prejudiced by this misunderstanding, no performance analysis is needed. *Strickland*, 466 U.S. at 697; *McGowan v. State*, 2006 ME 16, ¶ 13, 894 A.2d 493 ("if it is determined that there was no prejudice, there is no need to address the first prong regarding whether counsel's performance was deficient").

27

## CONCLUSION

Because Mr. Cardilli has proved that trial counsel's failure to vigorously argue self-defense under 17-A M.R.S. section 108(2)(A) constitutes ineffective assistance of counsel, and that the waiver in written closing argument could have affected the integrity of the factfinding process, the court must grant the petition for post-conviction review. This court wants to make it clear that this decision is not an indication that deadly force in defense of a person was justified in this case. Rather, this decision is that Mr. Cardilli was entitled to have that defense fully and effectively litigated in a cohesive defense strategy, and that that did not occur, in violation of the 6th Amendment to the United States Constitution and the doctrine set out in *Strickland v. Washington*.

**Entry is:**

Petitioner Mark Cardilli Jr.'s Petition for Post-Conviction Relief is hereby Granted. The present criminal judgment is vacated. The matter is remanded for a new trial. [9] The clerk may enter this Order on the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: 8/22/23

_____
John O'Neil Jr.
Justice, Maine Superior Court

---

[9] This court has requested that Chief Justice Robert Mullen of the Maine Superior Court specially assigned a trial justice for any further proceedings in this matter.

28